## Samuel Heyman et al. *v.* CBS, Inc.

Cotter, C. J., Loiselle, Bogdanski, Longo and Peters, Js.

Argued March 16—decision released July 3, 1979

*Austin K. Wolf* and *Stewart I. Edelstein,* with whom, on the brief, was *James J. O'Connell,* for the appellants-appellees (plaintiffs).

*Gary A. MacMillan,* with whom, on the brief, were *George F. Lowman* and *Jerod A. Rosenthal,* for the appellee-appellant (defendant).

PETERS, J. This case concerns the enforceability of a contract arising out of the sale and leaseback of real estate. After the defendant attempted to exercise the option to purchase contained in the contract of lease, the plaintiffs brought this action for a declaratory judgment to determine the enforceability of the option clause and to recover on various ancillary monetary claims. The defendant answered and counterclaimed, urging enforcement of the option and entitlement to monetary compensation. This appeal by both parties followed from the judgment of the trial court finding for the defendant on the plaintiffs' complaint and for the plaintiffs on the defendant's counterclaims.

The underlying facts found by the trial court are not in dispute. In 1957, Reeves Soundcraft Corporation (Soundcraft), the defendant's predecessor in interest, purchased unimproved and unencumbered real estate on Great Pasture Road in Danbury, for the purpose of constructing a plant to manufacture magnetic recording tape. Soundcraft decided not to construct the plant itself but rather to have it constructed by Lazarus Heyman, the plaintiffs' predecessor in interest, under a sale-leaseback arrangement in which Soundcraft would be granted an option to repurchase the property. Accordingly, the property was sold and a lease was executed between Soundcraft and the Old Colony Company, a corporation owned by Lazarus Heyman. There-

after the plant was built and the lease term of twenty-one years was by agreement of the parties stipulated to begin on October 1, 1958. Because the construction required outside financing, the lease from the outset provided for the possibility of subordination of the lease to a mortgage lien not to exceed a fixed amount which ultimately came to be set at $500,000. The Prudential Insurance Company of America (Prudential) became the construction mortgagee and subsequently the take-out permanent mortgagee. Appropriate subordination agreements were concluded among Soundcraft, Old Colony, and Prudential; they were accompanied by hold harmless agreements protecting Soundcraft from defaults by Old Colony.

After completion of the construction, Old Colony assigned its interest in the property to Lazarus Heyman. That interest is now held by the plaintiffs, Samuel Heyman and Abigail Heyman. Soundcraft in turn in 1969 sold out to the defendant CBS, Inc. CBS elected in 1975 to exercise its option to purchase the property and duly gave the plaintiff the required notices thereof. CBS, but not the Heymans, appeared at an attempted closing on October 31, 1975, where CBS was prepared to tender a check in the amount of $292,800. The plaintiffs refused to convey, contending that the option clause was unenforceable because of the Statute of Frauds, and this litigation ensued.

The trial court concluded that the option clause satisfied the requirements of the statute of frauds[1] and denied the plaintiffs' monetary claims except

---

[1] The trial court also concluded that the plaintiffs were estopped from relying on the defense of the statute of frauds. Because of our disposition of the principal issue concerning the statute, we do not reach the question of estoppel.

for an entitlement to interest from the date of the abortive closing to the date of the judgment. The plaintiffs appeal from all of these conclusions. The court also denied the defendant's counterclaims alleging breach of lease by the plaintiffs' failure to cooperate in the defendant's effort to obtain a zoning variance and alleging monetary damages arising out of the plaintiffs' refusal to convey the property. The defendant's cross appeal challenges these latter two determinations.

# I

The central issue on the plaintiffs' appeal is the enforceability of Article VIII of the Agreement of Lease as amended in 1960. Article VIII is entitled "Option to Purchase" and states, in relevant part: "The Tenant is hereby given an irrevocable option to purchase the demised premises at October 31, 1970, at October 31, 1975, or on October 31 of any year thereafter until the end of the term of the Amended Lease, provided that at the time of exercising such option, the Tenant shall not then be in default in the performance of any of the terms, provisions and covenants of the Amended Lease, on the following terms: If the option is exercised . . . at October 31, 1975, $292,800 . . . . The option shall be exercised by written notice . . . . It is agreed that time is of the essence with respect to such closing date and if for any reason the Landlord shall be unable or shall fail to deliver the deed upon such closing date no further base rental shall be due or payable subsequent to such closing date. Upon the closing of the transaction, the Landlord shall deliver to the Tenant a warranty deed and the Tenant shall pay to the Landlord in cash or certified or bank check any balance of the purchase price over the

amount then due upon any existing mortgage or mortgages. Not less than twenty (20) days prior to said closing date, the Landlord shall deliver to the Tenant a statement subscribed by the holder or holders of any existing mortgage or mortgages stating the unpaid amount of principal and interest, together with a copy of the mortgage or mortgages; provided, however, that the Tenant shall be required to accept a conveyance of said premises subject to an outstanding mortgage or mortgages only if such mortgage or mortgages contain a provision for prepayment without penalty or with a penalty or single charge of not more than two percent (2%) of the then outstanding principal balance. If a greater prepayment penalty or charge is provided for, the amount of such excess shall be deducted from the purchase price. In the event that the Landlord fails to deliver said statement and said copy of the mortgage or mortgages within such period, said premises shall be conveyed to the Tenant upon the closing date, free and clear of all liens and encumbrances. In the event that at the time of the closing of the purchase of said premises by Tenant in the exercise of its option as aforesaid, there are outstanding mortgages aggregating more than the purchase price payable by the Tenant, the Landlord shall take such steps as may be necessary for the partial discharge of such outstanding mortgage lien or liens so that upon the closing of the transaction, such outstanding liens shall not exceed the purchase price payable by the Tenant."

The trial court found that the defendant, CBS, was on October 31, 1975, the date on which it attempted to exercise its option, ready and able to comply with all of the requirements of the option clause. It was not in default and had given the

appropriate notices. The plaintiffs had failed to provide the defendant with any statement about outstanding mortgage indebtedness, which the court nevertheless found to be in the amount of $222,432.17 as of October 31, 1975. On the basis of these findings the court concluded that the defendant had by its tender of $292,800 on October 31, 1975, duly performed all of the conditions to be performed on its part, and as of that date became the equitable owner of the property.

The plaintiffs do not deny that these findings of fact are amply supported by the evidence before the trial court but argue rather that the option clause violates the statute of frauds, General Statutes § 52-550. Although the option price of $292,800 is on its face unassailably specific, they maintain that other language in the option clause fatally undermines this specificity. In particular, the plaintiffs point to the language that "the Tenant shall pay . . . any balance of the purchase price over the amount then due upon any existing mortgage or mortgages" and to the provisions about the effect of prepayment penalty clauses on the option price.

It is important to place this argument into context. The statute of frauds applies, of course, to contracts concerning real property and a fortiori to options to purchase real property. *Pigeon* v. *Hatheway,* 156 Conn. 175, 181, 239 A.2d 523 (1968); *Didriksen* v. *Havens,* 136 Conn. 41, 46, 68 A.2d 163 (1949). The statute requires such contracts, in the absence of extenuating circumstances such as part performance or reliance, to be memorialized by an adequate written memorandum. *Botticello* v. *Stefanovicz,* 177 Conn. 22, 31, 411 A.2d 16 (1979); *Montanaro* v. *Pandolfini,* 148 Conn. 153, 157, 168

A.2d 550 (1961); *Santoro* v. *Mack,* 108 Conn. 683, 687–88, 145 A. 273 (1929). Because the primary purpose of the statute is to provide reliable evidence of the existence and the terms of the contract, the requirements of the statute can be met either by a single document or, as in this case, by a series of related writings which, taken together, describe the essential terms and conditions of the contract. *Vachon* v. *Tomascak,* 155 Conn. 52, 56–57, 230 A.2d 5 (1967); *Burns* v. *Garey,* 101 Conn. 323, 329, 125 A. 467 (1924); *Shelinsky* v. *Foster,* 87 Conn. 90, 97–98, 87 A. 35 (1913); Restatement (Second), Contracts § 208 (Tentative Draft 1973).

In 1975, when the defendant CBS invoked its rights under the option clause contained in the amended 1960 lease, any ambiguities about mortgage commitments or penalty clauses had long since been resolved by formal written agreements to which all of the parties (or their predecessors in interest) had, in one form or another, agreed and subscribed. On March 8, 1961, Old Colony, Soundcraft, and Prudential met and closed the permanent mortgage loan and subordination transactions. They executed a mortgage, a mortgage note from Old Colony to Prudential, and a subordination agreement among Prudential, Old Colony, and Soundcraft. These agreements spell out, in full detail, the rights and duties of the parties; the subordination agreement explicitly contains a provision preserving the tenant's option to purchase in the event of default by Old Colony. The parties stipulated, and the court found, that between 1957 and 1961, the only mortgage on the property was the construction mortgage between Old Colony and Prudential, and that thereafter the only mortgage was the permanent mortgage executed on March 8, 1961.

The plaintiffs maintain that these events do not save the contract from the statute of frauds because compliance with the statute must be determined prospectively, as of the time of the execution of the contract, rather than retrospectively, as of the time a party seeks to enforce its terms. That is not the law. Nothing in the statute of frauds imposes a time constraint upon the component writings which, taken together, constitute the written memorandum. Even if this highly formalized and well-documented transaction of sale and leaseback[2] had been voidable at its inception in 1957 because of then unresolved uncertainties about outside financing, an issue that we need not resolve, such uncertainties can be cured by the parties at a later date. We have repeatedly recognized that a contract is enforceable, despite the statute, when, subsequent to the making of the contract, there has been conduct that amounts to part performance. *Botticello* v. *Stefanovicz,* supra; *Santoro* v. *Mack,* supra, 690–91; see Restatement (Second), Contracts § 197 (Tentative Draft 1973). It would be strange indeed to refuse equal recognition to subsequent written manifestations of assent that much more directly satisfy the evidentiary purpose of the statute. As this court held in *Handy* v. *Barclay,* 98 Conn. 290, 295, 119 A. 227 (1922): "The memorandum of the contract need not be the contract itself . . . . The memorandum need not be made at the time of the contract; it may be made and signed afterward. . . . '"The moment written evidence of the contract under his hand, in whatever form, exists, the contract is taken out of the statute,"'"

---

[2] In their brief as appellees on the defendant's counterclaims, the plaintiffs themselves characterize the sixteen-page lease as one that exhaustively sets forth the complete agreement of the parties.

citing Wood on Statute of Frauds, § 334.  See 2 Corbin, Contracts § 503 (1950); Restatement (Second), Contracts § 214 (Tentative Draft 1973).

At the time CBS exercised its option, therefore, the written lease executed in 1960, supplemented by the agreements signed in 1961, had resolved any latent ambiguities about the purchase price.  There was no further doubt about the terms and conditions of the existing mortgage, whose outstanding indebtedness as of October 31, 1975, was clearly $222,432.17.  Cross-references in both sets of documents adequately demonstrate their interconnection. By 1975, the prepayment provisions of the mortgage and mortgage note were no longer problematic, having come to comply with the 2 percent stipulation of the option clause.  The option to purchase complies, as the trial court concluded, with the requirements of the statute of frauds.  See *Didriksen* v. *Havens,* 136 Conn. 41, 47, 68 A.2d 163 (1949); *Schneidau* v. *Manley,* 131 Conn. 285, 290–91, 39 A.2d 885 (1944).

## II

The plaintiffs have briefed two additional assignments of error.  Because the defendant CBS has remained in possession of the Danbury property continuously since October 31, 1975, and has paid no rent since that date, the plaintiffs claim that they are entitled to monetary compensation.

The second count of the plaintiffs' complaint alleged that the defendant's right to continue in possession of the Danbury premises had terminated by reason of nonpayment of rent, and asked for damages.  The trial court concluded that this claim could not survive the conclusion that the option clause was enforceable.  We agree.  Article VIII of the

amended lease, the option clause reprinted above, explicitly makes time of the essence with respect to the stipulated closing dates and specifies that "no further base rental shall be due or payable subsequent to such closing date." Under the terms of the contract, and as equitable owner of the property, the defendant was relieved of any further rental obligation by its valid tender of payment on October 31, 1975.

The plaintiffs also complain that the trial court erred in its award of interest to them. The court determined that the defendant's tender of the purchase price, although valid at the date of the closing, had not thereafter been kept open, a conclusion not challenged by the defendant on this appeal. The court therefore awarded interest to the plaintiffs from the date of the tender to the date of its memorandum of decision enforcing the option clause. The plaintiffs maintain that this award is inadequate in that interest should continue to run until the defendant has paid in full. Whether interest is allowable at all is a matter resting in the sound discretion of the trial court. *Lewin & Sons, Inc.* v. *Herman,* 143 Conn. 146, 151, 120 A.2d 423 (1956). We cannot say that this discretion was abused under the circumstances of this case in which the plaintiffs' wrongful refusal to convey has continued to this date to be a salient factor in the defendant's continued nonpayment.

## III

The defendant has appealed from rulings of the trial court denying it the relief it sought under its second and third counterclaims.[3] These counter-

---

[3] The defendant did not appeal from the judgment on its first counterclaim or on its fourth counterclaim.

claims relate to the defendant's efforts to respond most efficiently to relatively recent regulations of the state department of environmental protection requiring the defendant to recapture manufacturing solvents previously exhausted into the atmosphere.

The trial court found, on ample evidence, that early in 1974 the defendant decided to install distillation towers at the Danbury property. These towers were designed to recover, redistill, and reuse solvents utilized in the manufacturing operations at the defendant's plant on the property. The defendant asked the plaintiffs to sign an application for a zoning variance to enable the defendant to install this equipment to a height exceeding the limitations of applicable Danbury zoning regulations. The plaintiffs' refusal to sign the zoning variance application constitutes the gravamen of the defendant's counterclaims. The defendant claims that its inability to erect the distillation equipment on the property required it to incur substantial expenses to ship its chemicals to off-site reprocessing facilities. These expenses are sought to be recovered as damages under the counterclaims.

In the second counterclaim, the defendant alleged that the agreement of lease entitled it to cooperation from the plaintiffs in the prosecution of necessary permits, licenses, or zoning proceedings. The trial court, after reviewing the terms of the lease, concluded that the plaintiffs had no contractual or other obligation to sign the defendant's application for a zoning variance. The defendant concedes, as it must, that the lease contains no express provision requiring cooperation in general or acquiescence in zoning applications in particular. Nonetheless, the defendant argues that such an obligation arises by necessary implication from the terms of the lease.

Three provisions of the lease were included in the trial court's finding as relevant to its determination of this counterclaim. Sections 6 and 7 of Article IV gave the defendant extensive rights to make alterations, improvements, or additions to the property without the consent of the plaintiffs.[4] Section 4 of Article IV, however, restricted the defendant's right to use the leased premises by requiring compliance with all present and future applicable laws, ordinances and regulations.[5]

The language of the lease fully supports the determination of the trial court that the plaintiffs were not obligated to sign the zoning variance application. Although a lease, like any other contract, implies a

[4] Section 6 states, in part, "Tenant may make such alterations and improvements in and to the leased premises and the buildings thereon as it may deem desirable for its use thereof, provided such alterations and improvements do not substantially ·alter the basic structure of the buildings or adversely affect the soundness or value thereof. Any repairs, improvements, or alterations involving an expenditure in excess of $20,000 shall be considered substantial so as to require prior notice to the Landlord." Section 7 states, in part, "Tenant shall not demolish any buildings on the leased premises without the written consent of the Landlord. Tenant may, however, construct any addition or additions to any building on the leased premises or erect new buildings or other improvements on the leased premises, provided (a) prior notice is given to the Landlord where such additions or new construction shall cost more than $20,000, (b) such additions or new construction shall be of a type which would not detract from existing buildings, and shall be of substantial construction consistent with the then existing improvements, and (c) when required by Landlord, a copy of the plans and specifications therefor shall be furnished to Landlord."

[5] Section 4 states: "Tenant may use the leased premises for any lawful purpose and shall comply with all present and future applicable laws, ordinances and regulations of duly constituted public authorities now or hereafter in any manner affecting the leased premises, the sidewalks adjacent thereto or any buildings thereon or the use thereof, whether any such laws, ordinances or regulations which may be hereafter enacted involve a change of policy on the part of the governmental body enacting the same. Tenant shall not permit any unlawful occupation, business or trade to be con-

duty of cooperation and fair dealing; see *Central New Haven Development Corporation* v. *La Crepe, Inc.*, 177 Conn. 212, 217, 413 A.2d 840 (1979); Restatement (Second), Contracts § 231 (Tentative Draft 1973); such a duty does not necessarily imply acquiescence in zoning variances. "A term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument." *Texaco, Inc.* v. *Rogow*, 150 Conn. 401, 408, 190 A.2d 48 (1963), and see Restatement (Second), Contracts § 230 (Tentative Draft 1973). The provision of Section 4, Article IV, requiring unconditional compliance with present and future laws and ordinances, envisages the possibility of regulatory change. Although the parties might well have incorporated into that clause a methodology for joint amelioration of the impact of regulatory change, the fact remains that they did not do so. It is hornbook law that courts do not rewrite contracts for the parties. *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 373–74, 321 A.2d 444 (1973); *Connecticut Union of Telephone Workers* v. *Southern New England Telephone Co.*, 148 Conn. 192, 200, 169 A.2d 646 (1961). The defendant does not argue that the term it would now like to add was omitted from the lease by reason of error or mistake, nor does it claim that without such a term the lease has become impracticable.

The trial court's interpretation of the lease was therefore entirely reasonable. Interpretation

---

ducted on the leased premises or any use to be made thereof contrary to any law, ordinance or regulation. Tenant shall be entitled to whatever opportunity is reasonable under all circumstances to contest the validity of any such laws, ordinances or regulations adversely affecting its use of the leased premises. Tenant shall, however, hold Landlord financially harmless from the consequences of any violation of such laws, ordinances or regulations."

requires a determination of the intention of the parties as manifested by their words and conduct. "Intention is an inference of fact, and the [trial court's] conclusion is not reviewable unless it was one which the trier could not reasonably make." *Hydro-Hercules Corporation* v. *Gary Excavating, Inc.,* 166 Conn. 647, 653, 353 A.2d 714 (1974). There was no error as to the defendant's second counterclaim.[6]

The defendant's third counterclaim sought damages for the plaintiff's wrongful delay in consummating the transfer of the property after the defendant's rightful exercise of its option to purchase. The defendant claims that this delay has disabled it from acting as owner to procure the zoning variance that would allow on-site rather than off-site processing of manufacturing solvents. This claim depends, of course, on our conclusion, in part I, that the purchase option was valid and enforceable, but it is independent of the alleged duty of the plaintiffs to cooperate in the processing of zoning variance applications while the lease was in effect. The trial court rejected the third counterclaim without any specific finding other than that the defendant had continuously remained in possession of the property, without payment of rent or other charges, from the date of its exercise of its option to purchase. The parties' pretrial stipulation to limit the present proceedings to issues of substance, and to postpone questions relating to damages to a later hearing, may well account for the sparsity of this record.

---

[6] In light of this decision that there was no contractual duty on the part of the plaintiffs, we need not consider the defendant's claim of error with respect to the finding, since concededly the draft finding at issue is relevant only to the issue of breach.

A trial court's determination to award or to refuse damages as an incident to a decree of specific performance rests to a significant extent in the exercise of the court's discretion, "depending upon the equities of the case and based on reason and sound judgment." *Schneidau* v. *Manley,* 131 Conn. 285, 289, 39 A.2d 885 (1944); *Lombardi* v. *Laudati,* 124 Conn. 569, 576, 200 A. 1019 (1938). This discretion cannot appropriately be exercised, however, until the parties have had the opportunity to inform the court about the damages that have proximately ensued from the wrongful withholding of the property.

The defendant's claim of law on the damages resulting from the plaintiffs' delay in conveying title in this case may have appeared to the court to be extraordinarily unlikely to succeed, since the foreseeability of particular environmental regulations at the time of the making of the lease is plainly a major obstacle to recovery. The defendant nonetheless is entitled to a day in court on that issue unless it should be deemed to have abandoned that right by the puzzling way in which it presented that claim in its draft finding. In asking the trial court to rule on its claim, the defendant sought damages for the natural and proximate consequences of the plaintiffs' failure to convey the property in accordance with the terms of the purchase option. The trial court may well have rejected this claim of law as unresponsive to the evidence before it. The defendant in continuous possession, without any further rental obligations after its exercise of the option, had suffered no obvious "natural" damages, and the claim did not clearly allege a right to special, consequential damages. From the evidence presented in the briefs before us, and in the printed record and the appendix, it appears that only damages arising

out of the expenses of the off-site processing were actively being pressed in the trial court, and such expenses would not be "natural and proximate" but rather would constitute damages ordinarily characterized as "special" or "consequential." See *Hadley* v. *Baxendale,* 9 Exch. 341 (1854); Calamari & Perillo, The Law of Contracts 525 (2d Ed. 1977); Restatement (Second), Contracts § 365 (Tentative Draft 1979).

Although it is therefore apparent that the issues relating to damages were not presented to the trial court in the most helpful way possible, we should not speculate about the extent to which earlier trial developments, or the stipulation to separate questions of liability and damages, may have contributed to the confusion. The parties are entitled to a hearing on the plaintiff's monetary liability for its delay in conveying the property, and the court was in error in denying them this opportunity.

There is error in part, the judgment is set aside and the case is remanded for further proceedings limited to the issue of damages presented by the defendant's third counterclaim.

In this opinion the other judges concurred.