### LEONARD G. COHEN ET AL. *v.* MATTHEW MEOLA ET AL.

| SUPERIOR COURT | JUDICIAL DISTRICT OF LITCHFIELD | FILE NO. 028498 |

Memorandum filed April 14, 1980

*Louden, Byrne, Shechtman, Slater & Rose,* for the plaintiffs.

*Gradowski & Miles,* for the defendants.

BORDEN, J.  On May 20, 1978, the defendants leased to the plaintiffs their lakefront house and property located at 40 Candlewood Springs, New Milford, for the period June 2, 1978, through September 10, 1978. The lease contained the following clause:  "Tentants [sic] to have first right of refusal before the house is sold to anyone else."  The intention of the parties as to the meaning of this clause was that it applied only during the rental period; that if the defendants entered into a contract with someone else to sell the property they had to notify the plaintiffs, who had thereby the prior right to purchase the property on essentially the same terms and conditions as those specified in that contract; and that no adjustment in the purchase price of the property was contemplated by the parties depending on whether or not the contract with the other buyer involved a real estate agent's commission.  The agent of the defendants for purposes of the lease and possible sale to the plaintiffs under the clause in the lease was Baldwin Realty (hereinafter Baldwin).  This agency relationship was created on behalf of the defendant Josephine Ann Meola as principal by virtue of her executing a nonexclusive listing agreement with Baldwin; and on behalf of the defendant Matthew Meola as principal by his holding Baldwin out as his agent by signing the lease which acknowledged Baldwin as broker.  The lease was drafted by Baldwin.  The plaintiffs took possession under the lease.

On July 14, 1978, the defendants entered into a written contract to sell the property for $75,000 to the Waymouths which acknowledged and was subject to the plaintiffs' right of first refusal. This contract described the property completely; was subject to a 30 day, $60,000, 9.5 percent mortgage commitment contingency clause; had a closing date of September 18, 1978; and contained a representation by the purchasers that no broker was the procuring cause of the contract. By letter dated June 19, 1978, Baldwin notified the plaintiffs that the defendants "have an offer on their property" and asked if the plaintiffs, in view of their right of first refusal, were interested in purchasing it. This letter did not disclose the terms of the "offer"; did not disclose that a contract had been signed; and, as to price, stated ambiguously that the offer was "not a full price offer" and that Baldwin felt that the defendants would take about $78,500. By letter of June 23, 1978, to Baldwin, the plaintiffs requested the specifics of the "offer." By letter of July 1, 1978, to the plaintiffs, the defendants demanded that the plaintiffs enter a formal contract by July 25, 1978, or lose their first right of refusal. On July 10, 1978, the plaintiffs wrote back to the defendants again requesting the specifics. On July 27, 1978, the defendants' attorney sent the plaintiffs a copy of the Waymouth contract and informed them that if they intended to purchase the price would be raised above the $75,000 to include a brokerage commission to Baldwin.[1] On August 2, 1978, the plaintiffs' attorney wrote to the defendants' attorney notifying him of the plaintiffs' intention to purchase on the same terms and conditions as set forth in the Waymouth contract, but

---

[1] The defendants appear to claim they were justified in refusing to sell to the plaintiffs for $75,000 without any deduction from their net proceeds for commission. If, however, this was their intention it was never expressed to the plaintiffs before the lease was signed; and it was incumbent on the defendants to make clear at the original signing of the lease their unexpressed desire to realize $75,000 net after any commission.

not agreeing to the increased price. This intention included, by necessary implication, a willingness to include a "no broker" representation by the plaintiffs. Negotiations continued by mail between the respective attorneys, resulting in a waiver on August 15, 1978, by the plaintiffs of any mortgage commitment contingency clause because they had already obtained a mortgage commitment. On August 16, 1978, the defendants' attorney sent the plaintiffs' attorney a proposed contract which, with two exceptions, was identical to the Waymouth contract. One of the exceptions, a lack of a mortgage commitment contingency clause, had been waived by the plaintiffs. The second, however, was of greater moment: in addition to the "no broker" representation, to which the plaintiffs had agreed, it contained clauses by which the plaintiffs would indemnify and hold the defendants harmless from liability for a brokerage commission and accept title subject to any encumbrance arising out of a claim for such a commission. The plaintiffs by letter of their attorney on August 21, 1978, balked at the inclusion of the indemnity and hold harmless clause and the clause requiring them to take title subject to the anticipated encumbrance, and reiterated their willingness to sign a contract with the exact provisions as were in the Waymouth contract, waiving, moreover, the mortgage commitment contingency. The defendants refused and this litigation ensued.

On August 18, 1978, the plaintiffs had obtained a 45 day commitment from the New Milford Bank and Trust Company for a mortgage of $56,250 at 9.5 percent to be amortized over 25 years by equal monthly principal and interest payments of $491.47, in connection with which they paid a $50 appraisal fee. The plaintiffs were ready, willing and able to enter a binding agreement with the defendants on the exact same terms as the Waymouth contract and were ready, willing and able to close under such an agreement on

or before September 18, 1978. The bank extended its commitment to November 1, 1978, when it expired.

The plaintiffs had paid the defendants a $350 security deposit under the lease. They vacated the premises on September 10, 1978, leaving it in clean condition and free of any damage or loss of personalty caused by them. They requested return of the security deposit by letter of September 29, 1978; but the defendants' attorney forwarded them a check for $284.67, representing the $350 less a debit of $70 for damages, cleaning and missing items claimed by the defendants plus a credit for the 4 percent statutory interest. The plaintiffs returned the check. The defendants continue to hold the security deposit.

Since the plaintiffs vacated the premises the defendants have leased it, from September 29, 1978, to the date of the trial, for gross rentals totaling $6300. In calendar 1978 their total gross rental income was $5100; and their total expenses were $1641.46. Of the $5100, $2400 was for the period after the plaintiffs vacated. It is a fair inference, therefore, which the court draws, that something less than ½ of the total yearly expenses, or $800, is allocable to that period. The expenses in 1979 were also approximately $1600; and for the first quarter of 1980, approximately $400. The total expenses, therefore, for the period between September 10, 1978, and the trial were $2800; and the defendants' net rental income for that period was, therefore, $3500.

Such other findings of fact as are pertinent to the court's decision are contained in the remaining parts of this memorandum.

I

The foregoing facts compel the conclusion that the plaintiffs are entitled to a judgment of specific performance requiring the defendants to convey to them

the property described in the plaintiffs' exhibit 1 upon payment by the plaintiffs to the defendants of $75,000. See *New Haven Trap Rock Co.* v. *Tata,* 149 Conn. 181, 177 A.2d 798 (1962). Since the plaintiffs waived any mortgage commitment contingency, it would not comport with equity to reinstate it. Furthermore, since the Waymouth contract contained a "no broker" representation, and since the plaintiffs agreed to buy on the same terms as the Waymouths, the payment to the defendants should be accompanied by an identical representation.[2]

The defendants' claim that the first right of refusal violates the rule against perpetuities is without merit. The defendants have the burden of proof on this first special defense, as well as on the second, discussed below. *DuBose* v. *Carabetta,* 161 Conn. 254, 262, 287 A.2d 357 (1971). Like any other contract, the right of first refusal clause must be interpreted in light of all the facts and circumstances surrounding it. *Klein* v. *Chatfield,* 166 Conn. 76, 80, 347 A.2d 58 (1974). It is clear that the parties intended it to apply only for the lease period. Indeed, it is impossible for the court to conceive that they intended otherwise, considering that the parties were strangers to each other who were entering into a summertime three month lease of a lakefront house. Furthermore, the clause was drafted by the defendants' agent and must, therefore, be construed against them. *Southern New England Contracting Co.* v. *State,* 165 Conn. 644, 656, 345 A.2d 550 (1974). Finally, language fairly construable to avoid a perpetuities violation should be so construed. *Bankers Trust Co.* v. *Pearson,* 140 Conn. 332, 355, 99 A.2d 224 (1953). Therefore, *Lewis Oyster Co.* v. *West,* 93 Conn. 518, 107 A. 138 (1919), relied on by

---

[2] The court does not pass on the legal effect, if any, such a representation will have in the event that Baldwin successfully asserts a claim for commission.

the defendants, is not in point. Under these circumstances the right of first refusal did not violate the rule against perpetuities.

The defendants' claim that the lease and its right of first refusal component violate the statute of frauds, § 52-550 of the General Statutes, is without merit. Under *Kilday* v. *Schancupp,* 91 Conn. 29, 98 A. 335 (1916), the description of the property is adequate. The lease describes the property as the defendants' three bedroom house located at Candlewood Springs with acreage of "50 plus or minus waterfront." The document is dated at New Milford and is on a printed form of the Greater New Milford Board of Realtors, Inc. At trial the defendant Josephine A. Meola identified the property without objection as 40 Candlewood Springs, New Milford. See *McMahon* v. *Plumb,* 88 Conn. 547, 552, 92 A. 113 (1914). The defendants also claim that the agreement inadequately defines when the agreement for the plaintiffs' right of first refusal was to end. In view of the finding that it was to end on September 10, 1978, the rule is that performance was to be within a reasonable time after exercise of the right to purchase by the plaintiffs. See *Parkway Trailer Sales, Inc.* v. *Wooldbridge Bros., Inc.,* 148 Conn. 21, 26, 166 A.2d 710 (1960).

Most importantly, moreover, the Waymouth contract signed by the defendants fully filled any gaps left by the original agreement. That agreement was to the effect that the plaintiffs had the prior right to purchase on the same terms and conditions as agreed on between the defendants and any other prospective purchaser. The Waymouth contract specifically referred to the plaintiffs' agreement with the defendants. The Waymouth agreement and the original agreement between the parties "taken together, describe the essential terms and conditions of the contract" and thereby satisfy the statute of frauds. *Heyman* v. *CBS, Inc.,* 178 Conn. 215, 221, 423 A.2d 887 (1979).

These two documents, signed by the defendants, suffice to take the agreement between the parties out of the statute. " 'The memorandum of the contract need not be . . . made at the time of the contract; it may be made and signed afterward. . . . "The moment written evidence of the contract under his hand, in whatever form, exists, the contract is taken out of the statute." ' "  Id., 222–23, citing Wood on Statute of Frauds § 334.

## II

In addition to a decree of specific performance, the plaintiffs seek monetary damages based on the increase in the mortgage interest rate they must now pay to finance the purchase. The defendants dispute such a basis of damages.

The determination of whether to award or refuse damages incident to specific performance, and the calculation of those damages, "rests to a significant extent in the exercise of the court's discretion, 'depending upon the equities of the case and based on reason and sound judgment.' *Schneidau* v. *Manley,* 131 Conn. 285, 289, 39 A.2d 885 (1944); *Lombardi* v. *Laudati,* 124 Conn. 569, 576, 200 A. 1019 (1938)." *Heyman* v. *CBS, Inc.,* supra, 229.

The plaintiffs' original $56,250 mortgage commitment called for 25 years of monthly payments of $491.47. At the time of trial such a mortgage was no longer available; the most favorable mortgage terms available[3] for a $56,250 (or 75 percent of purchase price of $75,000), 25 year mortgage were 14.25 percent plus a 3 percent origination fee. The plaintiffs submitted no evidence of the exact amount of loss to the plaintiffs based on a 14.25 percent mortgage; but did so with respect to a 13.25 percent mortgage, which evidence the court accepts as true. The in-

---

[3] In line with their duty to mitigate damages the plaintiffs should be limited to the best terms available.

crease in the interest rate from 9.5 percent to 13.25 percent on principal of $56,250 payable in equal monthly payments of principal and interest over 25 years, will result in monthly payments by the plaintiffs of $666.37, or $174.90 over and above the originally contemplated $491.47. To compensate the plaintiffs for this increased cost the most feasible way would be to award them an amount equal to the cost of a single payment annuity from an insurance company which would guarantee to pay them $174.90 per month for 25 years. The lowest such cost available is $22,494.71.[4] The defendants cannot complain that this cost is based on a $56,250 mortgage as opposed to the mortgage contemplated by the Waymouth contract, since that mortgage was $60,000, which, if obtained by the plaintiffs, would have produced a greater cost of annuity. This method of proving the plaintiffs' damages, in the absence of other evidence, is reasonable. "While other methods of computation might have been acceptable, alternative methods of determining damages for breach of contract may be employed to meet the exigencies of any given situation. The test is the 'reasonableness' of the method used. See 5 Corbin, Contracts § 1029." *Southern New England Contracting Co.* v. *State,* 165 Conn. 644, 662, 345 A.2d 550 (1974).

Although the plaintiffs eventually waived any mortgage contingency clause, it was clearly foreseeable and within the contemplation of the parties that they would be financing the purchase by way of a mortgage. The Waymouth contract, which the plaintiffs' right of first refusal was keyed into, had a mortgage

---

[4] The court rejects the plaintiffs' claim that, because this cost is based on an interest rate below the 14.25 percent available at time of trial, the amount should be $24,166.52, which is the cost from another insurance company. The plaintiffs still have the duty to mitigate; and awarding the higher amount would go beyond " 'the equities of the case and . . . reason and sound judgment.' " *Heyman* v. *CBS, Inc.,* 178 Conn. 215, 229, 423 A.2d 887 (1979).

commitment contingency clause. The plaintiffs only waived such a clause because at the time of the waiver they had already obtained a mortgage commitment. When the plaintiffs waived the clause, they informed the defendants that that was the reason for the waiver.

The question, then, is whether equity, sound reason and judgment require that this increased cost due to the dramatic rise in the interest rates from September, 1978, to March, 1980, be borne by the plaintiffs or the defendants. The court concludes that it should be borne by the defendants. First, the defendants' duties were fairly clear; their breach was fairly flagrant; and the plaintiffs went to considerable lengths to accommodate the defendants within the bounds of their agreement. Second, the parties foresaw and contemplated that the purchase would be financed by a mortgage.

This method of calculating damages, based on an increase in interest costs, while never specifically recognized by a Connecticut Supreme Court case, has been at least adverted to twice, in cases in which, for one reason or another, the claimant failed sufficiently to establish the loss. See *Bertozzi* v. *McCarthy*, 164 Conn. 463, 470, 323 A.2d 553 (1973); *West Hill Construction Corporation* v. *Horwath*, 149 Conn. 608, 612, 182 A.2d 919 (1962).

Upon the specific performance the plaintiffs will suffer a loss, therefore, of $22,494.71. To this must be added the 3 percent origination fee on the $56,250 mortgage, or $1,687.50, and the $50 appraisal fee on their original mortgage commitment, for gross damages of $24,232.21. If the defendants, however, had not breached, the plaintiffs would have had to pay $18,750 of their own funds, the use of which they have otherwise had since September, 1978. That amount placed in 6 month certificates of deposit from

September, 1978, through the date of trial would have yielded them $2,660.52. Thus the $24,232.21 amount must be reduced by $2,660.52, for a net loss by the plaintiffs, resulting from the defendants' breach of the agreement, of $21,571.69.[5]

The plaintiffs also claim damages for loss of rental value of the house. The court declines to award this. There was no showing by the plaintiffs that they intended to rent it had the defendants not breached. Under these circumstances equity, reason and sound judgment do not indicate an award of damages for loss of rental income.

### III

The facts clearly indicate a violation of § 47a-21 (d) by the defendants in refusing to return the full security deposit to the plaintiffs. They are therefore liable under § 47a-21 (d) (2) for twice the value of the security deposit and interest. Under § 47a-22 they are liable for interest at 4 percent on the $350 from June 3, 1978, to the date of trial, or $23.40. The total amount of statutory damages under this claim is, therefore, $350 plus $23.40, or $373.40, x 2, or $746.80.

### IV

Accordingly, judgment shall enter in favor of the plaintiffs as follows: (1) in the amount of $746.80; and (2) for a decree of specific performance of the property described in the plaintiffs' exhibit 1 upon payment by the plaintiffs to the defendants of $75,000, plus or minus any customary real estate transaction adjustments, together with a "no broker" representation

---

[5] The court rejects the plaintiffs' claim that the proper credit should be $1518.78, the amount that $18,750 would have yielded in a regular passbook savings account. Since the court's judgment awards them the house, they in fact have had the funds available and should be required to give the defendants the benefit of the maximum safe return available to them.

by the plaintiffs to the defendants identical to that contained in the plaintiffs' exhibit 2; and (3) in the event the plaintiffs comply with their obligations as to the $75,000 payment and the "no broker" representation, a judgment of $21,571.69 in favor of the plaintiffs against the defendants shall enter. Furthermore, the plaintiffs shall have the right to effectuate clauses (2) and (3) of this paragraph by offsetting the $21,571.69 against the $75,000; and, therefore, in lieu of clauses (2) and (3) judgment shall enter for a decree of specific performance of the subject property upon payment by the plaintiffs to the defendants of $53,428.31, plus or minus any customary adjustments, together with the "no broker" representation. Counsel for the plaintiffs shall prepare the judgment, forward it to the defendants' counsel for endorsement to the effect that it is consistent with the decision, and file it with the court for approval and filing.