[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff commenced this action against the defendant for payment of group insurance policy commissions pursuant to an oral contract between the parties. A court trial on the claims contained in the plaintiffs amended complaint dated April 17, 2001, commenced on May 14, 2002 and to various dates thereafter until the close of evidence on July 1, 2002. The parties submitted post trial briefs on September 6, 2000, and their respective reply briefs on September 20, 2002. By consent of the parties, the court's time period to render a decision pursuant to General Statutes § 51-183b was extended to February 3, 2003.
In the First Count of the amended complaint, the plaintiff alleges that he and the defendant, a Rhode Island corporation acting by its president, Samuel Fleet, entered into an oral contract to be performed in the State of Connecticut. The subject of the contract was the joint marketing to the Connecticut Bar Association (CBA) of group life, medical and disability insurance packages. The plaintiff was to introduce the defendant to the CBA and would use his best efforts to help procure joint insurance programs for the defendant with the CBA and it membership. If successful the plaintiff would receive a portion of the commissions paid. Additionally, the plaintiff alleges that the agreement would continue to apply to any and all group and individual policies administered and sold through the defendant, so long as the defendant continued writing insurance business through the CBA.
The plaintiff states that he and the defendant, were successful in obtaining insurance business from the CBA, and that the defendant continues to sell and administer the CBA group insurance program. However, the plaintiff alleges that the defendant only paid the plaintiff his commissions for an approximate two-year period and has refused to pay the plaintiff his agreed upon commissions for the years following.
The defendant admits that it entered into an oral agreement with the plaintiff to share certain commissions with the plaintiff regarding the CT Page 1026 CBA insurance policies, but it denies that it agreed to pay commissions to the plaintiff beyond those commissions that it has already paid. Furthermore, the defendant has raised the statute of frauds, General Statutes § 52-550 as a special defense, stating that any oral contract to pay additional commissions is unenforceable.
The Second Count of the amended complaint alleges a similar oral contract between the parties regarding the plaintiffs effort to procure insurance policy commissions for the defendant by marketing and administering group insurance products for the Connecticut State Dental Association (CSDA). Once again, the plaintiff claims that the defendant and he agreed orally that the plaintiff would continue to receive a portion of the insurance commissions for all periods of time that the defendant continued to administer and sell polices to the CSDA and its membership. The plaintiff claims that the defendant has refused to pay him his full commissions pursuant to their oral agreement.
The defendant, while admitting that it had discussions with the plaintiff regarding proposals to be submitted to the CSDA, denies that it ever entered into an oral agreement with the plaintiff concerning the sharing of commissions for group insurance marketed for and obtained from the CSDA. The defendant, once again, pleads the statute of frauds, General Statutes § 52-550 as a special defense. Additionally, the defendant claims that to the extent that any agreement did exist between the parties, the plaintiff accepted sums in full satisfaction of any claims set forth in the Second Count, and that the defendant is entitled to a credit for any such sums paid to the plaintiff.
 I
The court finds that the plaintiff and the defendant began discussions with each other in the summer of 1993 on a plan to market medical insurance to the CBA through the defendant. They ultimately agreed that they would jointly propose a medical insurance program to the CBA, whereby NEBCO would sell policies to individual members of the Bar that were issued by the Homelife Financial Assurance Corporation (Homelife). They agreed that the plaintiff and NEBCO would each receive a 5% commission from the total commissions of 15%. In addition to its 5% commission, NEBCO would also retain a 5% general agent's fee. In exchange for his 5% share of the commissions, the plaintiff Feen was required to perform a variety of duties involving the marketing and implementation of the Homelife policies, and the plaintiff did, in fact, perform these duties until early 1996.
In January, 1994, the parties were informed by the CBA that Homelife CT Page 1027 had been approved as the carrier for the CBA's group medical insurance, and Mr. Fleet for NEBCO and the plaintiff were appointed as the endorsing agents of record. NEBCO began administering medical insurance policies to CBA members that were underwritten by Homelife, and the plaintiff was paid his commission percentage. Subsequently, Anthem purchased Homelife, and the plaintiff continued to receive his commissions of 5% pursuant to his agreement with NEBCO's president, Samuel Fleet.
In late 1995, NEBCO began work on a new proposal for the CBA to use the CNA insurance as the new underwriter for the CBA's medical insurance plans for policies to be issued to the CBA's membership. This new proposal involved a change in the structure of commissions, as the CNA policies did not include a standard agent's commission similar to the Aetna-Homelife policies. The CBA policies, instead, included an administrative fee, which required NEBCO to pay all claims and to administer the policies.
By letter dated January 26, 1996, NEBCO informed the plaintiff by letter, that it would be presenting the CBA with the new CNA medical program proposal at a meeting scheduled for February 21, 1996. The letter also requested Feen's desired compensation so that NEBCO could include it in the proposal to the CBA. At this time, NEBCO had already presented the CBA with an informal proposal which included a 15% administrative fee for NEBCO and nothing for the plaintiff. NEBCO was aware that any compensation for Feen, in addition to the NEBCO administrative fee, was likely to be rejected by the CBA, and, in fact the CBA did subsequently reject it. A review of the exhibits and testimony establishes that as of February 16, 1996, five days before the meeting with the CBA on February 21, 1996, NEBCO and its president, Mr. Fleet had still not sent a copy of the CNA proposal for Feen to review. Thus, when Feen requested one-third of a 22.5% commission, which he understood was available to NEBCO, Feen had no idea that NEBCO had already offered to accept a 15% commission/administrative fee, which would result in no commission percentage being available to pay Feen. In fact, Fleet notified the CBA by letter dated February 20, 1996, one day before the meeting with the CBA, that NEBCO required only a 15% fee and that the increased demand of 22.5% was due solely to Feen's demand for compensation.
The meeting with the CBA was held on February 21, 1996. Subsequently, by letters to each party dated February 22, 1996, Joseph Mike, a consultant for the CBA, informed Feen and NEBCO that it would not pay a 22.5% commission. The CBA informed the parties that it would review a separate proposal from Feen, should he wish to submit one, and thereafter, the CBA would choose between the NEBCO proposal and one to be submitted by Feen. The plaintiff Feen's proposal had to be submitted by CT Page 1028 March 11, 1996, which presented the plaintiff with a difficult, if not impossible task. In fact, the letter from Mr. Mike in behalf of the CBA to Fleet and NEBCO dated February 22, 1996, indicates that the CBA had already determined that it would accept NEBCO's proposal. While informing NEBCO that it had given Feen until March 11, 1996 to submit a separate proposal, the letter of February 22, 1996, stated, "The Joint Insurance Committee (CBA) has reviewed your recommendation and has determined it to be preferable to continuing the current program with Homelife".
Due to the shortness of time given to present a proposal, Feen ultimately submitted a proposal to the CBA by March 11, 1996, that Feen admitted "wasn't the best." On March 12, 1996, the CBA notified NEBCO that it had chosen NEBCO's plan with CNA for its health insurance program. The CBA specifically noted that it was rejecting the proposal for a 22.5% commission for NEBCO and that it "expected" NEBCO to abide by the original proposal by NEBCO for a 15% total commission. NEBCO, thereafter refused to pay Feen any commission fee or compensation for policies written through the CNA for health insurance for the membership of the CBA.
The court finds that the actions of NEBCO and its president, Samuel Fleet, violated the terms of the oral contract entered into with the plaintiff Carl. S. Feen, as it related to NEBCO's marketing of group health insurance to the Connecticut Bar Association and its membership. The oral contract between the parties does not violate the statute of frauds, General Statutes § 52-550.[1]
Connecticut courts have held that the Statute of Frauds "covers only those contracts whose performance cannot possibly be completed within a year. Finley v. Aetna Lfe Casualty Co., 202 Conn. 190, 197,520 A.2d 208 (1987), citing 1 Restatement (Second), Contracts. If no time is fixed, but full performance may occur within one year, the statute does not apply. Burkle v. Superflow, 137 Conn. 488, 492-93, 78 A.2d 698
(1951). "An oral contract that does not say, in express terms, that performance is to have a specific duration beyond one year is, as a matter of law, the functional equivalent of a contract of indefinite duration for the purposes of the statute of frauds. Like a contract of indefinite duration, such a contract is enforceable because it is outside the proscriptive force of the statute regardless of how long completion of performance will actually take." C.R. Klewin, Inc. v. FlagshipProperties, Inc., 220 Conn. 569, 583-84, 600 A.2d 772 (1991).
The sharing of fees between the parties was based on a joint broker of record letter issued to Feen and NEBCO by the CBA. The plaintiff and the defendant recognized that the insured could withdraw the broker of record CT Page 1029 letter at any time. There was no term set forth in the CBA agreement, and it was possible that the CBA could have withdrawn the broker of record letter in less than one year. For the statute of frauds to apply to the parties' oral contract, the defendant must show something specific in the record to support a finding that the contract required performance at an express time outside of a one year period from the making of the contract. Chase Pratt, LLC v. Aetna Lfe Insurance Co., Superior Court, judicial district of Hartford at Hartford, Nos. CV96-0560740, CV97-0568688 (March 26, 1999) (Teller, J.), citing Pagano v. Ippoliti,245 Conn. 640, 647, 716 A.2d 848 (1998). There is no such testimony before this court.
Additionally, the agreement regarding the oral contract to provide group medical insurance to the CBA is enforceable since there was partial performance by each party. Feen helped effect the obtaining of the CBA account and actively participated for two years in the marketing of the product. NEBCO recognized an agreement with Feen by working with him; presenting a plan to the CBA; by assigning certain duties to Feen; and by paying him one-third of the overall commissions on the Home-Life policies, which later became the Homelife-Anthem policies. Even if the statute of frauds was applicable, an oral contract is enforceable "when subsequent to the making of the contract, there has been conduct which amounts to part performance." McNeil v. Riccio, 45 Conn. App. 466, 470,696 A.2d 1050 (1997); Heyman v. CBS, Inc., 178 Conn. 215, 222, 423 A.2d 887
(1979). See also Breen v. Phelps, 186 Conn. 86, 439A.2d 1066 (1982).
The parties do not disagree as to the evolution of their fee and commission sharing agreement for selling policies to the CBA with Homelife and Anthem as the underwriters. The stories of the parties, however, do diverge on the question of what would happen in the event that NEBCO continued to sell policies to the CBA with an underwriter other than Homelife-Anthem. The plaintiff alleges that the parties contemplated a two-thirds to one-third split on any commissions and fees regardless of the underwriter. The defendant, in turn, argues that the parties contemplated renegotiating their fee-sharing agreement on an ad-hoc basis if the underwriters were changed. Ultimately the matter of which party to believe is a matter of credibility of the parties. The court finds the plaintiffs testimony to be more credible.
A review of the record supports the plaintiffs position that the plaintiff would be entitled to a one-third split of the commissions regardless of which underwriter was used for the CBA policies. The fee splitting agreement was reached between the parties in 1993, and then put into effect when they negotiated and created an agreement with Homelife and the CBA. The defendant had no contacts or relationship with the CBA CT Page 1030 prior to the summer of 1993. The defendant pursued a relationship with the plaintiff to get access to the CBA. The defendant agreed to pay the plaintiff a one-third commission split primarily because he needed the plaintiff to put NEBCO in a position to sell CBA policies. Once NEBCO obtained the CBA account it set out at the first opportunity and excuse it could find, to force the plaintiff out of the CBA commission picture.
Feen never interfered with NEBCO's relationship with the CBA. On the other hand, NEBCO, through Fleet, kept the plaintiff uninformed regarding NEBCO's preliminary proposals to the CBA, regarding a change of underwriters to the CNA. By the time the plaintiff became aware of the specifics of the CNA proposal, the defendant had already agreed to a 15% commission for the CNA policies. Only then was the plaintiff offered a meaningless opportunity to request a commission share by raising the total commission fee percentage to the CBA from the 15% figure submitted by NEBCO to an increased commission fee figure of 22.5%. It is clear that NEBCO had no expectation that the request for 22.5% would be accepted by the CBA. Why should they accept it when NEBCO, itself, had already agreed to do it for 15%? The court agrees with the plaintiff when he argues that the defendant knew it was under a continuing obligation to share fees with the plaintiff for the CBA group medical insurance policies, and that the defendant attempted to avoid that obligation by excluding the plaintiff from the new policies for the CBA to be underwritten by the CNA.
The defendant argues that the oral contract of the parties only covered the Homelife and later, the Anthem policies, and that they only had an "agreement to agree" in the future on a commission split of policies that may be written by a carrier other than Homelife or Anthem. In fact, the parties through attorneys did negotiate about reducing their agreement to a writing beginning in 1994, but lacking any agreement the negotiations ceased. A proposal drafted by Feen and his attorney was rejected by Mr. Fleet and NEBCO in a letter dated January 12, 1995. However, in that letter, Fleet acknowledged the existence of an oral agreement with Feen and stated that "So long as you do not interfere with my business relationship with CBA and CSDA (Connecticut State Dental Association), NEBCO will of course continue to honor our agreements for existing association business with the Connecticut Bar Association and the Connecticut State Dental Association." Lacking any new agreement, the prior agreement remained in force. No where in the letter is there any reference to the CBA agreement being limited to only Homelife-Anthem policies.
The defendant argues that the plaintiff Feen did interfere with NEBCO's relationship with the CBA, by submitting an independent proposal to the CT Page 1031 CBA by March 11, 1996. The court disagrees. Feen was given no other choice but to submit his own proposal after NEBCO had effectively excluded him from the new proposal to utilize the CNA for underwriting the CBA insurance policies. Feen had already been informed that the 15% commission fee proposal to the CBA for the CNA policies did not include any commission fee for Feen. He was informed by Mr. Mike, the CBA's consultant, that the CBA would not increase the commission fees payable to NEBCO to 22.5% to allow Feen a commission fee. The CBA informed Feen he would have less than three weeks to submit his own proposal to the CBA, independent of NEBCO's proposal. Feen's submission of a separate proposal was his only solution to a scenario which had been orchestrated and set in motion by Fleet and NEBCO. NEBCO cannot now avail itself of the special defense that Feen had waived any commission from the CNA policies because he was interfering with NEBCO's business relationship with the CBA.
In assessing damages due to the plaintiff for the defendant's breach of the oral contract for payment of commissions for the CBA group insurance policies from 1996 through 2002, the court has relied upon the transcript of the trial testimony, trial exhibits 15, 16, 17, 18, 19 and 27A and the defendant's exhibit C, which was attached to the defendant's post-trial brief. This exhibit C is separate and distinct from the defendant's trial exhibit C. The court acknowledges that the defendant, in submitting the exhibit C attached to its Post Trial Brief, does not admit or concede that the plaintiff is due any damages. Exhibit C was submitted by the defendant to "merely clarify" the amounts claimed by the plaintiff. However, as the court has concluded that the plaintiff is, in fact, due damages pursuant to his claim in count one, the court finds that it is necessary to compare the plaintiffs calculations of damages to the defendant's calculations.
In computing damages on a yearly basis for the years 1996 through 1999, the court uses a consistent methodology. The court computes a total net figure to NEBCO, including the categories of gross profit and interest-other income, and subtracting from that figure the line items identified as total selling expenses. The court then multiplies the new net figure by one-third, representing the plaintiffs 2% commission.
In 1996, the gross profit and interest-other income is $66,888.89. Once the total selling expenses of $14,501.10 are subtracted, the net to NEBCO is $52,397.59. The plaintiff is awarded one-third of that sum for a total due in the amount of $17,448.40.
In 1997, the gross profits and interest-other income total is $63,537.02. Once the total selling expenses are subtracted, the net to CT Page 1032 NEBCO is $51,965.20. The plaintiffs one-third total is $17,304.41.
In 1998, the gross profits and interest-other income to NEBCO totals $56,053.94. The selling expenses subtracted from that amount are $7,206.77, leaving a net to NEBCO in the amount of $52,133.74. The plaintiffs one-third award is $17,360.54.
Accepting the plaintiffs explanation regarding the calculations for gross receipts in 1999 and 2000, court finds that in 1999, NEBCO's gross profits were $44,356.52 and the interest-other income total was $3,666.02. Once the selling expenses of $10,867.39 are subtracted from the above-listed totals the net to NEBCO for 1999 is $37,055.15. The plaintiffs one-third commission is $12,339.36.
For the year 2000, the court finds the gross profits for NEBCO were $50,967.33 and the interest-other income total was $4,439.26. The total selling expenses of $2,445.44 are subtracted, resulting in a net to NEBCO of $52,961.15. The plaintiffs one-third award for that total is $17,636.06.
In awarding damages for the plaintiff commissions due for the calendar years 2001 and 2002, the court faces a more difficult computation. At the time of trial the parties had incomplete financial information available regarding the calendar year 2001, and no information for the first six months of 2002. Plaintiffs exhibit 27A which is his claimed damage calculations for the CBA policy commissions, utilizes the year 2000 figures as a basis for his 2001 and 2002 calculations. The defendant in submitting figures for 2001, does so by use of his exhibit C, attached to his post-trial brief, for which there are no supporting trial exhibits, such as profit-loss statements. The defendant has not submitted any calculation for the year 2000 in its post-trial brief or its supporting exhibit C.
The court, not wishing to resort to surmise, guess, or speculation, finds that the most equitable manner of assessing damages for the years 2001 and 2002 is to use an average net profit to NEBCO, basing the calculation on the net profits for the last three years preceding 2001. The average yearly net profits to NEBCO for 1998, 1999 and 2000 are $47,383.35. For the year 2001, the plaintiffs one-third commission is $15,778.66. As the evidence concluded on July 1, 2002, the court limits its award to the plaintiff for 2002, to six months. The plaintiffs commission due to him for 2002, is $7,889.33.
In summary, the court finds that the plaintiff has prevailed in his claim for commissions due from the defendant for insurance policies CT Page 1033 marketed by NEBCO to the Connecticut Bar Association through Homelife-Anthem and subsequently, the CNA. The total commissions due the plaintiff from the defendant are $105,756.76. The defendant is entitled to a credit for any commission payments that it has made to the plaintiff for the years 1996 through June 30, 2002.
 II
The plaintiff's second count concerns allegations that the plaintiff and the defendant had a similar oral contract commencing in the summer of 1994, for insurance packages to be recommended to the members of the Connecticut State Dental Association. Once again, the parties are at odds concerning the division of commissions and the period of the contract.
Between January, 1994, and March, 1994, the plaintiff and Fleet, the president of NEBCO, discussed the possibility of NEBCO providing insurance for the CSDA. For several months, Fleet, in behalf of NEBCO and the plaintiff, negotiated with the CSDA concerning the percentage of insurance premiums that would be paid to NEBCO for health insurance policies issued to CSDA members. In September, 1994, NEBCO and the CSDA reached an agreement which provided that NEBCO would receive a commission in the amount of 6 percent. The written agreement between NEBCO and CSDA was for an initial term of one year commencing on November 1, 1994 with a two year renewal. Section 5 of the agreement which is plaintiffs Exhibit 3, discusses the term of the agreement, as well as, termination of the agreement and subsequent renewals beyond the above-described three year period. Under certain circumstances listed therein, the agreement could be terminated by the CSDA prior to the expiration of the initial one year term. Contract Exhibit C attached to the agreement between NEBCO and the CSDA sets forth the terms of compensation to NEBCO. The entire written agreement between the CSDA and NEBCO, is referred to as plaintiffs trial Exhibit 3.
There is no dispute between the parties that as a result of negotiations with Dr. Peter Buschetto of the CSDA, that the plaintiff Feen agreed to a 1% commission-finder's fee from the premiums in the first year of the agreement between the CSDA and NEBCO to induce the CSDA to sign the agreement with NEBCO. The plaintiff claims that in the second year he and Fleet agreed that the plaintiff would receive 2%, and thereafter, the plaintiff would continue to receive 2% during the years that followed, up to and including the present time. The plaintiff also claims that the defendant agreed to restore the plaintiffs 2% commission fee, retroactive to the first year of the agreement with the CSDA, if the defendant was successful in acquiring and maintaining the CSDA as a client. CT Page 1034
The defendant argues that the plaintiff, as a result of negotiations with the CSDA and Dr. Buschetto, agreed to accept a finder's fee of 1% of the policy premiums for the first year; one-half of 1% (0.5%) during year two of the agreement, and 0% during the third year of their agreement. The defendant denies that the plaintiff and NEBCO had any oral agreement for the compensation of Feen beyond the second year of the CSDA contract.
The defendant and the plaintiff agree that Feen was paid a 1% finder's fee for the first year of the CSDA contract by NEBCO. The defendant concedes that Feen is owed the sum of $10,791.60, the equivalent of 0.5% of the commissions for a ten month period of the second year of the contract. The defendant argues that payment to the plaintiff of this sum of $10,791.60 would constitute full performance of NEBCO's obligation to Mr. Feen for the CSDA agreement.
The court has reviewed the testimony of the plaintiff on May 29, 2002, and finds that the plaintiff and the defendant had no oral agreement for the compensation of the plaintiff beyond the initial one year period and the initial two year renewal of the agreement between NEBCO and the CSDA. The plaintiff admitted that while he had an expectation that he would receive a commission for the duration of the CSDA agreement, he and Fleet had no specific agreement for Feen's compensation beyond the initial one year of the CSDA agreement and the first two-year renewal period of that agreement.
Feen has consistently testified that he would receive a one-third split of the total 6% commission-administrative fee being paid to NEBCO. This was the identical commission splitting agreement that had been agreed to regarding fees paid to NEBCO by the CBA. Other than the first year of the CSDA agreement, where Feen admits that he agreed to reduce his commission split to 1%, the court does not find it credible or logical, for Feen to now agree to accept 0.5% in the second year of the CSDA agreement and no compensation in the third year. As to the subject regarding the amount of the plaintiffs commission for the CSDA agreement with NEBCO, the court does not find the testimony of Fleet or Dr. Buschetto credible.
Again, there is no written documentation between Fleet and Feen regarding their agreement as to the splitting of commissions for the CSDA agreement. There are letters from NEBCO (Fleet) to Dr. Buschetto regarding the commission fee proposals and the claimed reductions in Feen's "finders fee" as proposed by Fleet. Fleet claims he "blind copied" Feen on these letters, as Feen's name does not appear on the face of the letters as having been copied. CT Page 1035
NEBCO assured Dr. Buschetto and the CSDA that NEBCO would be paying Feen's fees, and that Feen's fees were not an expense that would be charged to the CSDA. Thus, Feen's fee was of no importance to Dr. Buschetto and the CSDA, as they were not paying it as an expense to the CSDA. The benefit of reducing Feen's fee would accrue to NEBCO and its president, Mr. Fleet, as it left a larger share of the commissions for NEBCO. It was in NEBCO's self interest only, to reduce Feen's commissions in the second and third year of the CSDA contract. The court in finding that Feen's commission was to be paid solely by NEBCO's and not the CSDA, is not certain what truly motivated the plaintiff to reduce his first year finder's fee-commission to 1%. However, the plaintiff has admitted to agreeing to the 1%, and the court will not tinker with this agreement by guess or surmise. Having gained this concession for the first year of the CSDA agreement from the plaintiff, the court does not find it likely or credible, that Fleet and NEBCO would agree to restore a 2% commission to the plaintiff retroactively for the first year, if NEBCO was successful in maintaining the CSDA account past the initial one year term.
The court does find, however, that Fleet, in behalf of NEBCO, unilaterally and without Feen's permission, reduced Feen's commissions for years two and three of the agreement. Mr. Fleet's actions regarding his attempt to push Mr. Feen "out of the picture," with the CSDA is similar to his actions towards Mr. Feen in NEBCO's dealings with the Connecticut Bar Association. The court finds Mr. Feen's testimony to be more credible than Mr. Fleet's, and therefore, finds that the plaintiff Feen was to receive a 1% commission in the first year of the agreement between NEBCO and the CSDA and a 2% commission in the second and third years, representing the initial two year renewal term.
The court rejects the special defense of the defendant that the oral contract between NEBCO and Feen violated the statute of frauds. The contract between the CSDA and NEBCO contains several paragraphs regarding termination of that contract that could have resulted in the contract being terminated in less than a one year period or at the end of the initial one year period. Additionally, there was conduct subsequent to the making of the contract that amounted to part performance. NEBCO admitted, through the testimony of Mr. Fleet, that it paid the plaintiffs fee commissions for the first year of the CSDA contract and that it owes him commissions for the second year.
In assessing the damages due the plaintiff pursuant to the oral contract between the parties regarding NEBCO's agreement with the CSDA, the court relies upon the transcript of the trial testimony, plaintiffs CT Page 1036 trial exhibits 20, 21, 22, 28A and 29A and the defendant's informational exhibit C, which was attached to the Defendant's Post-Trial Brief Again, the court acknowledges that the defendant disputes the damage claims and the damage computations of the plaintiff. The defendant has submitted its exhibit C for the purposes of damage computations at the court's request to assist the court in computing any applicable damages. Having found that damages are applicable, the court therefore, considers the defendant's computation schedule. It is noted that the defendant, however, has not submitted computations for 1995.
The court in assessing damages to the plaintiff uses a methodology similar t the one it used in assessing damages in count one. For 1995 the court finds that NEBCO's commissions were $234,162.59. The court subtracts the total selling expenses of the defendant in the amount of $17,642.91, leaving an amount of $216,519.68. The plaintiffs 1% is one-sixth of this total or $36,086.61. The defendant has paid the plaintiff the sum of $27,762.62, to date, for 1995. The defendant owes the plaintiff a balance of $8,323.94 for 1995.
For 1996, the net to NEBCO was $443,923.12. Interest and other income increases this total to $445,150.61. The court then subtracts the total selling expenses in the amount of $24,678.25, leaving a balance of $420,472.36 between the parties to be divided on a one-third to two-third basis, as the court has awarded the plaintiff a 2% commission in the second year of the NEBCO-CSDA agreement. The plaintiffs commission for 1996, which is owed to him by the defendant is $140,017.29.
The plaintiff is also due a 2% commission for 1997. The defendant's commissions plus interest and other income totals $374,554.18. Again, the defendant's total selling expenses are subtracted from this total, leaving a net of $352,258.57. One-third of this figure, representing the plaintiffs 2% share, is $117,302.10.
The total commissions due the plaintiff from the defendant as a result of the plaintiffs claims in count two regarding NEBCO's agreement with the CSDA are $265,643.33.
 III
In summary, the court finds that the plaintiff has sustained his burden of proof in establishing that the plaintiff and the defendant entered into an oral contract, wherein they agreed to a commission splitting agreement for the CBA and the CSDA group insurance policies. Regarding the plaintiffs allegations contained in count one, the court awards the plaintiff the sum of $105,756.76 and as to count two, the court awards the CT Page 1037 plaintiff the sum of $265,643.33. Total damages due the plaintiff from the defendant are $371,400.09. The defendant shall be entitled to a credit for any amounts it has previously paid the plaintiff for the periods of time the court has used in assessing and computing the damages stated herein.
THE COURT
 BY ___________________ Arnold, J.