# UNITED ILLUMINATING COMPANY *v.*
# WISVEST-CONNECTICUT, LLC
## (SC 16498)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued October 31, 2001—officially released March 12, 2002

*Stanley McDermott III*, pro hac vice, with whom were *John B. Farley* and, on the brief, *John W. Lemega*, for the appellant (defendant).

*Daniel J. Klau*, with whom was *William H. Prout, Jr.*, for the appellee (plaintiff).

### Opinion

VERTEFEUILLE, J. The sole question in this appeal is whether the language employed in three related agreements between the plaintiff and the defendant is clear and unambiguous, and, therefore, consideration of extrinsic evidence to ascertain the parties' intent is prohibited. The defendant, Wisvest-Connecticut, LLC, appeals from the judgment of the trial court vacating an arbitration award that had granted damages to the defendant. We conclude that the language used in the agreements, when considered as a whole, is ambiguous and the arbitration panel therefore properly considered extrinsic evidence to determine the parties' intent. Accordingly, we reverse the judgment of the trial court.

The record reveals the following facts and procedural history that are necessary for the resolution of this appeal. The plaintiff, United Illuminating Company, is an electric utility company that serves customers in south central Connecticut. In October, 1998, the plaintiff and the defendant, a company that purchases, develops and operates power generation assets, entered into a purchase and sale agreement whereby the defendant purchased a portion of the plaintiff's power generation assets. Despite the sale of these assets to the defendant, the plaintiff remained obligated to continue to provide electricity through June 30, 2000, to the retail customers in its retail service territory. The amount of electricity needed to supply these customers was denominated the "retail load." Although the plaintiff had not sold all of its generation assets to the defendant, the assets that the plaintiff had retained were not expected to deliver enough electricity to satisfy its full retail load. To cover this anticipated shortfall, the parties drafted a "power supply agreement," the interpretation of which is at issue in this appeal.

Under the terms of the power supply agreement, the defendant agreed to supply the plaintiff with the electricity required to bridge the gap between the amount of electricity the plaintiff's retained assets could generate and the amount needed to meet its retail load. The price for the electricity to be provided by the defendant was set forth in the power supply agreement. The parties also executed two letter agreements immediately prior to the execution of the power supply agreement. The first letter agreement (Hydro-Quebec agreement) addressed the manner in which the plaintiff was to use the electricity that it was purchasing from Hydro-Quebec, a Canadian utility company. The second letter agreement addressed the implementation of the power supply agreement in light of new market rules that had taken effect.

After the execution of all three agreements and the sale of the designated power generation assets to the defendant, the market price of electricity rose at times to unusually high levels. The plaintiff capitalized on these high prices by: (1) diverting from its retail load some of the electricity it generated on its own, specifically, the power it had purchased from Hydro-Quebec, and instead selling that electricity in the market at the prevailing high rates; and (2) purchasing from the defendant at the relatively low rates set in the power supply agreement the additional electricity it needed to meet its retail load. The defendant, claiming that these actions by the plaintiff were in violation of the agreements between the parties, initiated arbitration proceedings in accordance with the arbitration provision contained in the power supply agreement. Specifically, the defendant claimed that the language of the letter agreements, when construed together with the power supply agreement and considered in light of the circumstances surrounding the transaction, required the plaintiff to allocate all of the purchased Hydro-Quebec electricity to its retail load until a stated cap amount designated in the letter agreements was reached. Only after the cap amount was reached, the defendant contended, could the plaintiff sell in the open market the balance of the Hydro-Quebec electricity. Therefore, according to the defendant, the plaintiff materially had breached the contract when it sold the Hydro-Quebec electricity in the open market before it had allocated the full cap amount of Hydro-Quebec electricity to its retail load.

Three arbitrators were chosen for the arbitration panel and, after several days of hearings, the panel issued its decision and award. In a two to one decision, the panel majority concluded that the contract between the parties, as evidenced by the three agreements, was ambiguous with regard to whether the plaintiff had the

right to sell Hydro-Quebec electricity in the open market prior to reaching the designated cap amount. The panel majority then considered extrinsic evidence of the parties' intention in entering into the agreements and concluded that the plaintiff did not have the unfettered discretion to allocate the Hydro-Quebec electricity between its retail load and open market sales. The majority further concluded that the plaintiff therefore materially had breached the contract and it awarded the defendant damages in the amount of $1,359,476, plus interest. The dissenting member of the arbitration panel concluded that the language of the contract unambiguously granted the plaintiff the right to sell the pre-cap Hydro-Quebec electricity into the market. Therefore, the dissenting member concluded, the contract should have been enforced in accordance with its plain meaning without reference to extrinsic evidence.

The plaintiff filed an application with the trial court seeking an order vacating the arbitration panel's decision and award. The defendant filed a counterclaim to confirm the award. The trial court granted the plaintiff's application and denied the counterclaim, concluding that the language of the letter agreements was clear and unambiguous and that the majority of the panel improperly had considered extrinsic evidence of the parties' intent. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

As a preliminary matter, we acknowledge that our review in this case is limited. The arbitration provision in the power supply agreement provides that "[a]ll factual determinations made by the arbitrators shall be conclusive and binding on the Parties and not subject to judicial review." This appeal, therefore, is limited to the single question of law in this case: whether the contract is ambiguous under Connecticut law. *Imperial*

*Casualty & Indemnity Co.* v. *State*, 246 Conn. 313, 322 n.6, 714 A.2d 1230 (1998). Accordingly, our review is de novo.[1] Id.; *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 53, 607 A.2d 424 (1992).

In determining whether a contract is ambiguous, the words of the contract must be given "their natural and ordinary meaning." *Kelly* v. *Figueiredo*, 223 Conn. 31, 35, 610 A.2d 1296 (1992). A contract is unambiguous when its language is clear and conveys a definite and precise intent. *Levine* v. *Massey*, 232 Conn. 272, 278, 654 A.2d 737 (1995). "The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." (Internal quotation marks omitted.) Id., 279. "Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Stephan* v. *Pennsylvania General Ins. Co.*, 224 Conn. 758, 764, 621 A.2d 258 (1993). Furthermore, a presumption that the language used is definitive arises when, as in the present case, the contract at issue is between sophisticated parties and is commercial in nature. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 494–97, 746 A.2d 1277 (2000).

In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language

---

[1] "The well established general rule is that [w]hen the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement." (Internal quotation marks omitted.) *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, 257 Conn. 80, 84, 777 A.2d 169 (2001). Ordinarily, the scope of our review is determined by whether the submission was restricted or unrestricted. In this case, however, the arbitration provision in the contract provides: "Any conclusions of law made by the arbitrators shall be subject to review in any court of competent jurisdiction within the State of Connecticut . . . ." Accordingly, our review of the arbitration panel's conclusions of law is de novo.

of the contract itself. See *Levine* v. *Massey*, supra, 232 Conn. 278–79. "[A]ny ambiguity in a contract must emanate from the language used" by the parties. (Internal quotation marks omitted.) Id., 279. The contract must be viewed in its entirety, with each provision read in light of the other provisions; *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, 248 Conn. 350, 356, 727 A.2d 1260 (1999); and every provision must be given effect if it is possible to do so. *Kelly* v. *Figueiredo*, supra, 223 Conn. 36. In addition, "[w]hen there are multiple writings regarding the same transaction, the writings should be considered together" in construing the contract. *Mongillo* v. *Commissioner of Transportation*, 214 Conn. 225, 229, 571 A.2d 112 (1990). If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. *Lopinto* v. *Haines*, 185 Conn. 527, 538, 441 A.2d 151 (1981).

The defendant claims on appeal that the trial court improperly concluded that the contract was clear and unambiguous on its face. Specifically, the defendant argues that the trial court placed undue emphasis on its predicate determination that the Hydro-Quebec agreement was intended to modify the appendix to the power supply agreement, which set forth the manner in which the quantity of electricity to be delivered would be calculated, and the court failed to consider adequately the purpose of the modification. The language in the Hydro-Quebec agreement, the defendant contends, did not clearly and unambiguously grant the plaintiff the right to sell Hydro-Quebec electricity in the open market prior to reaching the cap amount designated in that agreement. Rather, the language in the Hydro-Quebec agreement merely placed a cap on the amount of Hydro-Quebec electricity that the plaintiff otherwise would have been required to apply to its retail load. The plaintiff responds by arguing that the language in the Hydro-Quebec agreement granted the plaintiff the

unfettered discretion to determine unilaterally whether the Hydro-Quebec energy would be applied to its retail load or sold in the open market.

On the basis of our review of the power supply agreement and the Hydro-Quebec agreement, we agree with the defendant that the language of the agreements was ambiguous. We conclude that the contract between the parties was ambiguous with regard to whether the plaintiff had the right to sell Hydro-Quebec electricity in the open market prior to reaching the designated cap amount, in lieu of utilizing that electricity to satisfy the plaintiff's retail load.

We begin our analysis with the terms of the power supply agreement. That agreement clearly provided that the term "retained assets," as used therein, included the plaintiff's power purchase agreement with Hydro-Quebec.[2] The appendix to the power supply agreement described generally the manner in which the quantity of "delivered energy"—the electricity to be provided by the defendant—was to be calculated. More specifically, the appendix provided, with regard to the calculation of delivered energy for the 1999 calendar year: "*Genera-tion from the Retained Assets* at the appropriate capacity factors and as defined in the Power [Supply] Agreement *will first be utilized to meet the [retail] load requirements.* . . . The remaining [retail load] requirement will be the Delivered Energy and is the portion purchased by [the plaintiff] from [the defendant]." (Emphasis added.) Under the terms of the power supply agreement, therefore, the plaintiff was obligated to apply all of the Hydro-Quebec electricity to its retail

---

[2] The term "retained assets" was defined in article one of the power supply agreement as "the [plaintiff's] ownership interests in Seabrook Station [in] Seabrook, New Hampshire, Millstone Station Unit No. 3 [in] Waterford, Connecticut, and [the plaintiff's] purchased power agreements with the Bridgeport RESCO [an incinerator facility], Shelton Landfill and Derby Hydroelectric independent power producers and with Hydro-Quebec."

load prior to purchasing electricity from the defendant. The terms of the Hydro-Quebec agreement, however, purported to modify this obligation.

The Hydro-Quebec agreement provided that "[the plaintiff] will have *the right to utilize up to* the [cap amount] of the energy scheduled for delivery by [Hydro-Quebec] to serve [the plaintiff's] own retail load, and [the plaintiff] will sell into the market all energy scheduled for delivery by [Hydro-Quebec] in excess of that amount." (Emphasis added.) It appears from this provision that the Hydro-Quebec agreement was intended to modify the power supply agreement with respect to the plaintiff's use of Hydro-Quebec electricity.[3] It is not clear from the language employed, however, precisely how the parties intended to modify the plaintiff's use of that electricity. In particular, it is not clear whether the parties intended merely to reduce the quantity of Hydro-Quebec electricity that the plaintiff was required to apply to its retail load from 100 percent of what the plaintiff purchased to the designated cap amount, or whether they intended to grant the plaintiff the unfettered discretion to allocate Hydro-Quebec electricity between its retail load and market sales.

The Hydro-Quebec agreement provided that the plaintiff had the right to use up to the cap amount of Hydro-Quebec energy *"to serve [the plaintiff's] own retail load . . . ."* (Emphasis added.) That provision, however, addressed only the plaintiff's right to apply Hydro-Quebec electricity to its retail load, and nothing in this or any other provision of the Hydro-Quebec agreement provided expressly that the plaintiff had the right to sell precap Hydro-Quebec electricity in the open market. While it is not unreasonable to interpret this

---

[3] By its terms, the Hydro-Quebec agreement was executed "for the purpose of resolving an issue as to the meaning of Retained Assets in the Power Supply Agreement" with regard to Hydro-Quebec electricity.

provision to mean that the plaintiff also had the right to sell precap Hydro-Quebec electricity in the market, it certainly is not clear from the language of the provision that such a result necessarily was implied. *Heyman v. CBS, Inc.*, 178 Conn. 215, 227, 423 A.2d 887 (1979) ("[a] term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument").

Indeed, interpreting the language of the Hydro-Quebec agreement in such a manner could render meaningless the second half of the relevant provision, which provided that "[the plaintiff] will sell into the market all energy scheduled for delivery by [Hydro-Quebec] in excess of [the cap] amount." Although this clause did not prohibit expressly the plaintiff from selling Hydro-Quebec electricity in the open market prior to reaching the cap, interpreting the first clause of the provision to give the plaintiff the right to do so would appear to make the second clause superfluous. The law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous. *Kelly* v. *Figueiredo*, supra, 223 Conn. 36. At the very least, it is not clear and unambiguous from the language of the Hydro-Quebec agreement that the plaintiff had the right to sell Hydro-Quebec electricity in the open market prior to reaching the designated cap amount.

We conclude that the power supply agreement and the Hydro-Quebec agreement, read together, are ambiguous with regard to whether the plaintiff was obligated to utilize all of the Hydro-Quebec electricity to satisfy its retail load or whether the plaintiff, instead, had the right or discretion to apply only some of the Hydro-Quebec electricity to the retail load and the freedom to sell the balance of it in the open market. The presumption set forth in *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 494–97—that the language employed by sophisticated

parties in commercial contracts is clear and unambiguous—has been rebutted in this case. In light of that ambiguity, the majority of the arbitration panel properly considered extrinsic evidence to determine the parties' intent in entering into the contract. Because the power supply agreement precludes judicial review of the arbitration panel's factual findings, the findings made by the majority of the panel with respect to the intent of the parties in entering into the contract are final and conclusive. The trial court, therefore, improperly granted the plaintiff's application to vacate the award and improperly denied the defendant's counterclaim seeking to confirm the award.

The judgment is reversed and the case is remanded to the trial court with direction to deny the application to vacate the arbitration award and to grant the counterclaim seeking to confirm the award and to render judgment accordingly.

In this opinion the other justices concurred.