******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

VERTEFEUILLE, J., with whom PALMER and ROB-INSON, Js., join, dissenting. I respectfully disagree with the majority that the Appellate Court properly affirmed the trial court's summary judgment rendered in favor of the plaintiff, Anthony H. Salce, Sr., on the ground that the contingency clause of the buyout agreement between the plaintiff and the defendant, Walter Wolc-zek, is unambiguous and susceptible to one, and only one, reasonable interpretation. In so concluding, the majority determines that the parties necessarily intended to engraft the doctrine of equitable conver-sion[1] as an implicit term of their contract so that, if the defendant entered into a purchase and sale agreement within the period subject to the contingency clause, the plaintiff would receive a share of the " 'whole value' for any sale" in excess of $3.5 million, irrespective of whether legal title to the property was transferred within that period. I agree that such an interpretation is reasonable. I would further conclude, however, that the contingency clause is subject to another reasonable interpretation, under which the plaintiff would receive a share of the whole value of a sale only upon the defendant's transfer of the full legal title to the property or some portion thereof during the period of the contin-gency, as the defendant claims. Therefore, I respect-fully dissent.

It is important to underscore that "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circum-stances connected with the transaction." (Internal quo-tation marks omitted.) *Murtha* v. *Hartford*, 303 Conn. 1, 7, 35 A.3d 177 (2011). Intent usually is a question of fact. *19 Perry Street, LLC* v. *Unionville Water Co.*, 294 Conn. 611, 622, 987 A.2d 1009 (2010). It is only when the contract on its face reveals such a clear and definite expression of intent that we preclude the parties from proffering extrinsic evidence that might bear on that question. See *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 106, 84 A.3d 828 (2014); *19 Perry Street, LLC* v. *Unionville Water Co.*, supra, 623. No such definite expression exists, however, if the contract is "reason-ably susceptible to more than one reading." (Internal quotation marks omitted.) *Lexington Ins. Co.* v. *Lexing-ton Healthcare Group, Inc.*, 311 Conn. 29, 38, 84 A.3d 1167 (2014). Although we may presume that sophisti-cated commercial parties represented by counsel intend to provide sufficient definiteness to their commercial contractual arrangements so as to avoid such ambigu-ity; *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmis-sion System, L.P.*, 252 Conn. 479, 496–97, 746 A.2d 1277 (2000); that presumption is rebutted when those intentions have manifestly failed. See, e.g., *United Illu-*

*minating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 674–75, 791 A.2d 546 (2002).

In the present case, the stated purpose of the buyout agreement is the sale of the plaintiff's 50 percent ownership interest in a limited liability company, which holds title to certain real property in Trumbull, to the defendant, the owner of the other 50 percent interest in the company. This purpose sheds some light on "the situation of the parties and the circumstances connected with the transaction"; (internal quotation marks omitted) *Murtha* v. *Hartford*, supra, 303 Conn. 7; as we interpret the terms of the contingency clause at issue. That clause, entitled "Contingent Addition to Purchase Price," provides in relevant part as follows: "If within one year of the closing hereunder any ownership interest in the [p]remises . . . is transferred . . . based on a whole property value of more than [$3.5 million], [the defendant] shall pay [the plaintiff] an additional purchase price equal to one half the excess at the same time as the transfer. The 'excess' is the amount by which the whole property value for the transfer exceeds [$3.5 million]. The 'whole value' for any sale is the 100 [percent] value on which any percentage interest being transferred is based. For example, a one quarter interest transferred for [$1 million] would equate to a whole property value of [$4 million]. . . ."[2] The parties have stipulated that: on May 31, 2007, the plaintiff's sale to the defendant closed; on March 19, 2008, approximately six weeks prior to the expiration of the contingency clause, the defendant executed a purchase and sale agreement under which the property would be sold to a third party (Vaughn agreement) for a stated purchase price of $5.5 million; and on July, 1, 2008, approximately four and one-half weeks after the contingency clause expired, the closing of the sale occurred.

The defendant contends that the contingency clause is triggered upon the transfer of *legal* title to any *percentage* interest in the property. Because he did not transfer title to the subject property until the closing, he contends that he is not liable under that clause. The plaintiff contends that the contingency is triggered by the transfer of a legal *or equitable* interest, as well as any fractional interest thereof. More specifically, the plaintiff contends that the parties unambiguously intended to include an equitable interest created by application of the doctrine of equitable conversion when providing that the transfer of "any ownership interest" would trigger the contingency. The plaintiff contends that such an interest was created upon the execution of the Vaughn agreement, and therefore, the defendant is liable as a matter of law. For the reasons that follow, I would conclude that the defendant's construction is reasonable, the contingency clause is therefore ambiguous, and summary judgment was improper.

I first turn to the meaning of the key terms in the

contingency clause, beginning with the phrase "any ownership interest . . . ." One definition of ownership provides: "Collection of rights to use and enjoy property, including the right to transmit it to others. . . . The complete dominion, title, or proprietary right in a thing or claim. The entirety of the powers of use and disposal . . . ." Black's Law Dictionary (6th Ed. 1990).[3] Another definition provides that ownership is the "[l]egal right to the possession of a thing." American Heritage Dictionary of the English Language (3d Ed. 1992). Thus, the term ownership is ambiguous as applied to the question before us because it can mean the full bundle of property rights or certain fundamental legal rights, such as legal title or possession. Even when a purchaser is deemed to have an equitable interest in property, the purchaser does not obtain full rights of ownership until the transfer of absolute (or legal) title. See 14 Powell on Real Property (M. Woolf ed., 2004), § 81.01 [3] [a], p. 81-15; see also *Cavanaugh* v. *Richichi*, 100 Conn. App. 466, 469, 918 A.2d 290 (2007). Until such a transfer occurs, the seller retains many of the incidents of ownership. Principal among these is the right to possession of the property, as well as the right to collect profits or rents from the property and use them without restriction; see *Anderson* v. *Yaworski*, 120 Conn. 390, 393, 181 A. 205 (1935); 14 Powell on Real Property, supra, § 81.01 [3] [a], pp. 81-15 through 81-17; unless the contract specifies otherwise. See, e.g., *Chomko* v. *Patmon*, 19 Conn. App. 483, 484 n.1, 563 A.2d 311 ("[a] [b]ond for [d]eed . . . is an installment sale contract of real property where the buyer takes possession of the property but does not receive fee simple title of the property until a later date" [internal quotation marks omitted]), cert. denied, 212 Conn. 819, 565 A.2d 539 (1989).

Unlike the majority, I am not persuaded that any such ambiguity is dispelled by the mere fact that the contingency clause refers to "*any* ownership interest . . . ." (Emphasis added.) Although the majority determines that "any" is an unambiguous term that must be afforded the most expansive reading possible, this court previously has acknowledged that the meaning and scope of "any" is informed by the context in which it is used. See *Location Realty, Inc.* v. *Colaccino*, 287 Conn. 706, 724–25, 949 A.2d 1189 (2008) (concluding that because " 'any action' " was used in conjunction with phrase " 'no person,' " it should be afforded broadest possible formulation); *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 14–15, 938 A.2d 576 (2008) (reading " 'any' " in conjunction with words " 'without limitation' " in contract dispute to have expansive meaning); *AvalonBay Communities, Inc.* v. *Zoning Commission*, 280 Conn. 405, 414, 908 A.2d 1033 (2006) (noting that meaning of " 'any' " is context dependent but concluding, with regard to General Statutes § 22a-19, that "the repeated use . . . of the word 'any' . . .

indicates an intention to allow the broadest possible range of parties to intervene in an expansive spectrum of proceedings"); *Ames* v. *Commissioner of Motor Vehicles*, 267 Conn. 524, 531, 839 A.2d 1250 (2004) (noting that "any" is ambiguous term that, depending on "context" and "subject matter of the statute" may denote "all, every, some or one" [internal quotation marks omitted]).

When considering the broader context in which the term "any ownership interest" is used, I note that the contingency clause is replete with language *expressly* addressing fractional interests. The clause refers to "any percentage interest," "'whole value,'" and "100 [percent] value," and provides an example of the proper calculation of a whole value based on a transfer of a one-quarter interest. Moreover, an intention to address the specific concern of a sale of any partial legal interest in the property is consistent with the overarching purpose of the entire agreement, wherein a 50 percent share of ownership interest is being sold.

By contrast to the many references to fractional interests, there is no reference in the contingency clause at all to equitable interests. Had the parties wanted to manifest an unambiguous intent to encompass such an interest, the contingency clause easily could have referred to "legal or equitable" interests. Cf. General Statutes § 3-56a (11) (referring to "legal or equitable interest" in property); General Statutes § 12-392 (b) (3) (E) (same); General Statutes § 33-1036 (4) (same); General Statutes § 42-103dd (22) (same); General Statutes § 42a-9-318 (a) (same); General Statutes § 47-202 (17) (same); General Statutes § 49-61 (a) (same). Indeed, in the breach and remedy section of the agreement, the parties expressly referred to "any other remedy in law or equity available to [the] [s]eller," rather than simply "any remedy."

Other terms used in the contingency clause lend further support to the reasonableness of the defendant's construction. That clause refers to both a "transfer" and a "sale" in a manner suggesting that the terms refer to the same event triggering the contingency. One definition of "sale" provides: "A contract between two parties, called, respectively, the 'seller' (or vendor) and the 'buyer' (or purchaser), by which the former, in consideration of the payment of promise of payment of a certain price in money, transfers to the latter the title and possession of property. . . . A contract whereby property is transferred from one person to another for a consideration of value, implying the passing of the general and absolute title, as distinguished from a special interest falling short of complete ownership." Black's Law Dictionary (6th Ed. 1990). Because this definition provides that the property "is" transferred by way of such a contract, it potentially excludes an executory sales contract that would potentially give

rise to an equitable interest, because title is transferred at some later point in time. See also *Guilford-Chester Water Co.* v. *Guilford,* 107 Conn. 519, 527, 141 A. 880 (1928) ("sale" of property is "transfer of the absolute title therein for a price"); *Ray Weiner, LLC* v. *Bridgeport,* 150 Conn. App. 279, 286 n.7, 92 A.3d 258 (2014) (The court, when rejecting the plaintiff's claim that a sale is not limited to situations in which title passes but also can include a contract for sale, stated that "[t]his reading ignores the meaning of the verb 'transfer' contained in the definition of 'sale' in both the fifth and ninth editions of Black's Law Dictionary. 'Transfer' means 'a conveyance of right, title, or interest in real or personal property from one person to another.' Merriam-Webster's Collegiate Dictionary [11th Ed. 2012]. Therefore, the plaintiff cannot be a party to a sale because its contract remains executory and thus no transfer has occurred.").[4] Accordingly, it is apparent that the contingency clause is ambiguous as to whether the "sale" of "any ownership interest" extends to a purchaser's equitable interest because a purchaser of real property under an executory sales contract is not entitled to absolute title to, or possession of, the property until the delivery of the deed and payment, which typically occur at closing.

I fully agree with the majority that the use of the term "closing" throughout the buyout agreement and the use of the term "sale" in the contingency clause reflect a purposeful decision to distinguish the meaning of these terms. I disagree, however, that this distinction unambiguously evidences an intention inconsistent with the defendant's construction. Significantly, the term "closing" is used in the contingency clause, as well as other parts of the buyout agreement, to refer to a specific event—the transfer of legal title to, and ownership of, the plaintiff's 50 percent interest in Anwalt, LLC, to the defendant. In the contingency clause, that closing is the event that commences the period during which the defendant may be liable for an addition to the purchase price ("within one year of the closing hereunder"). By contrast, the "sale" or "transfer" of the defendant's ownership to a " '[n]on-Wolczek [p]erson,' " which is defined in the contingency clause of the parties' buyout agreement as someone other than the defendant or his immediate family member or lineal descendant, is the event that could trigger the defendant's *liability* within that period. Therefore, it is entirely plausible and rational that the parties could have chosen different terms simply to distinguish between two like events carrying different consequences. Moreover, by referring to a sale instead of a closing, the agreement makes clear that the defendant cannot avoid liability by transferring title without a formal closing.

Finally, I note that the contingency clause also provides that the defendant "shall pay . . . [the] addi-

tional purchase price . . . at the same time as the transfer." The defendant construes this provision as requiring payment of the contingency sum when he transfers legal title to the property. By contrast, the plaintiff's interpretation imposes liability at the time that a purchase and sale agreement is executed, under the assumption that an equitable interest is transferred at that time under the doctrine of equitable conversion. Under settled law, however, that doctrine does not necessarily arise upon execution of such an agreement. If a sales contract includes conditions that must be satisfied before title to the property can be transferred to the purchaser, the doctrine generally does not apply until those conditions have been satisfied. See *Francini* v. *Farmington*, 557 F. Supp. 151, 155 (D. Conn. 1982); 14 Powell on Real Property, supra, § 81.03 [1], pp. 81-85 through 81-86. Therefore, the transfer of an equitable interest, assuming application of the doctrine should apply, may occur at some point well after the execution of the sales agreement. Because the defendant's interpretation links liability to a specific event whereas the plaintiff's interpretation links liability to the particular terms of the purchase agreement and the parties' satisfaction of conditions therein, the defendant's construction not only is eminently reasonable but more consistent with a definite meaning that we presume is intended by sophisticated commercial parties. See *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 496–97.

In addition to the aforementioned textual ambiguities, potential inequities arising under the plaintiff's construction but not the defendant's lend support to the latter's view of the clause. The contingency clause renders the defendant liable when the whole value of a sale within the specified period exceeds $3.5 million, the presumptive value of the property under the buyout agreement. Under the defendant's construction, his liability would be assessed upon the transfer of title at closing, a point at which the purchase price paid in exchange for title presumably would reflect the property's fair market value. The plaintiff has conceded that under his construction, the defendant would be liable even if the sale never came to fruition, an onerous and unusual result. Although the plaintiff assumes that such a result would be warranted because the price in the purchase and sale agreement would reflect the fair market value of the property, that assumption will not always hold true. For example, an event subsequent to the execution of the sales agreement could reveal that the fair market value is substantially less than the stated purchase price (i.e., environmental contamination revealed upon inspection), causing the purchaser to renounce the sales agreement. Nonetheless, under the plaintiff's construction, the defendant still would be liable under the contingency clause to pay a percentage of the purchase price. One has to question whether a

commercially sophisticated party would agree to assume such a risk.[5] Moreover, such a result seems in tension with case law indicating that equitable conversion does not arise by operation of law in every case, but rather in light of the equities in the given case. See *FCM Group, Inc.* v. *Miller*, 300 Conn. 774, 798–99, 17 A.3d 40 (2011) (noting "limited circumstances" in which "a person who enters into a contract to purchase real property and is authorized by the seller or purchase agreement to make improvements to the property before the closing date, may, before legal title passes, acquire an equitable interest in the property sufficient to be considered an owner for purposes of . . . the mechanic's lien statute" [internal quotation marks omitted]); *Anderson* v. *Yaworski*, supra, 120 Conn. 393 (declining to apply doctrine under facts of case because result would be inequitable); see also R. Boyer, Survey of the Law of Property (3d Ed. 1981) p. 373 (equitable conversion "is limited in its application to cases where the intention of the parties [to the sales contract] will not produce an inequitable result, and where nothing has intervened which ought to prevent a performance").[6] The possibility of such an inequitable result under the plaintiff's construction lends further support to a conclusion that the contingency clause is ambiguous.[7]

It may well be that, after considering all of the evidence in the present case, including extrinsic evidence that the defendant contends proves that the parties intended for the contingency to apply upon the transfer of title at closing, the trial court will conclude that the parties intended for "any ownership interest" to encompass an equitable interest arising under equitable conversion. Because, however, the contingency clause is ambiguous as to whether that phrase means legal title to any percentage interest in the property or also equitable interests of any percentage, a trial is necessary to hear all relevant evidence as to the parties' intent. I therefore disagree that the Appellate Court properly affirmed the trial court's summary judgment rendered in the plaintiff's favor, and, accordingly, I respectfully dissent.

[1] Where applicable, "[u]nder the doctrine of equitable conversion . . . the purchaser of land under an executory contract is regarded as the owner, subject to the vendor's lien for the unpaid purchase price, and the vendor holds the legal title in trust for the purchaser. . . . The vendor's interest thereafter in equity is in the unpaid purchase price, and is treated as personalty . . . while the purchaser's interest is in the land and is treated as realty." (Citations omitted; internal quotation marks omitted.) *Francis T. Zappone Co.* v. *Mark*, 197 Conn. 264, 267, 497 A.2d 32 (1985).

[2] I agree with the plaintiff and the majority that the defendant's interpretation of the contingency clause as a profit sharing provision cannot be sustained in light of the language and structure of the buyout agreement. I disagree, however, that the purpose of the clause as providing a mechanism to adjust for the fair market value is dispositive of the question before us.

[3] See also Black's Law Dictionary (8th Ed. 2004) ("The bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others. . . . Ownership implies the right to possess a thing, regardless of any actual or constructive control.").

[4] Webster's Third New International Dictionary (2002) contains similar

definitions of "transfer" to the one cited by the Appellate Court in *Ray Weiner, LLC* v. *Bridgeport*, supra, 150 Conn. App. 286 n.7, which include "to make over or negotiate the possession or control of (a right, title, or property) by a legal process [usually] for a consideration: convey" and "the conveyance of right, title or interest in either real or personal property . . . by sale gift or other process."

[5] I recognize the possibility that, even if equitable conversion was assumed to apply, the defendant might avoid payment under such circumstances by asserting an equitable defense or claim, such as unjust enrichment. Nonetheless, the necessity of resort to such procedures in order to obtain a just result would seem to weigh in favor of the defendant's ambiguity claim.

[6] *Francis T. Zappone Co.* v. *Mark*, 197 Conn. 264, 497 A.2d 32 (1985), and its progeny, on which the plaintiff and the majority rely, are distinguishable. In *Francis T. Zappone Co.*, this court affirmed the trial court's judgment determining that the plaintiff real estate broker was entitled to recover on a promissory note executed to secure a real estate commission under a listing agreement, despite the fact that no transfer of title to the property occurred due to the purchasers' failure to render full performance many months after taking possession of the property and making payments to the seller. Id., 267–69. The trial court had rendered judgment after a trial to the court, not on the basis of a motion for summary judgment. Id., 266. The court applied case law establishing that, absent fraud or other improper practice on the part of the real estate broker, a commission is fully earned once the buyer and the seller execute a binding agreement. Id., 267–68; see also Black's Law Dictionary (6th Ed. 1990) (noting specific meaning of "sale" in context of relationship between landowner and real estate broker mean procuring ready, willing and able purchaser). The court cited the evidence in the record that established the plaintiff's entitlement to the commission under that principle. *Francis T. Zappone Co.* v. *Mark*, supra, 268. The court then rejected the seller's argument that the broker was not entitled to a commission because the listing agreement stated that the commission was due " 'upon the sale, exchange or transfer, or upon the exercise of any option to purchase,' " and, according to the seller, these conditions were not satisfied when there had been no transfer of legal title. Id. Although this court relied on the doctrine of equitable conversion in rejecting that claim, it did so in the face of: (1) a legal presumption that the broker was entitled to the commission upon execution of a binding sales agreement; and (2) terms in a listing agreement covering a broader range of conduct (sale, exchange, transfer, or exercise of option) than the language in the contingency clause in the present case. Id.

[7] The majority's view that the defendant's interpretation also could yield an inequitable result because the defendant could intentionally delay the closing to avoid application of the contingency clause is belied by the facts in this case. The plaintiff asserted several counts in his amended complaint premised on precisely such allegations (breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, unjust enrichment), but he chose to withdraw these counts to pursue the present appeal on the breach of contract issue. Thus, the plaintiff had alternative legal theories that he could have pursued to obtain relief even if he did not prevail on the breach of contract claim at trial.