******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

APPENDIX

## ROBERT CHIULLI, JR. *v.* CHRIS CHIULLI ET AL.*

Superior Court, Judicial District of Hartford

File No. CV-12-6036511S

Memorandum filed July 8, 2014

*Proceedings*

Memorandum of decision on plaintiff's action alleging, inter alia, breach of contract. *Judgment for the defendants*.

*George W. Kramer*, for the plaintiff.

*Richard P. Kuzmak*, *Joseph W. Bibisi* and *Eric H. Rothauser*, for the defendants.

*Opinion*

PECK, J. This lawsuit arises out of an agreement to share the proceeds from an anticipated sale of real property identified as Lots 3A and 3B Alumni Road, Newington. The plaintiff, Robert Chiulli, Jr., has sued his cousin, the defendant Chris Chiulli, and the latter's business, Double "C" Construction Company, LLC (Double "C"), in two counts alleging breach of contract and conversion and statutory theft, pursuant to General Statutes § 52-564. In count one, the plaintiff alleges that on February 4, 2008, the parties entered into a contract whereby, in exchange for the plaintiff filing a release of a notice of assignment on the Newington land records, the defendants promised to pay the plaintiff $30,000 upon the closing of the sale of those properties, and that the defendants sold the lots in question on or about February 18, 2011, but did not inform the plaintiff of that sale or pay him the $30,000. In count two, the plaintiff alleges that the defendants had the funds to pay the $30,000 from the sale of the properties in 2011 but failed to pay him, and that the failure to do so constitutes conversion and statutory theft. The plaintiff seeks damages in the amount of $30,000, attorney's fees and costs, punitive damages and treble damages pursuant to § 52-564. In their answer to the complaint, the defendants have denied the material allegations of both counts. A court trial was held on December 18, 2013, at which both Robert Chiulli, Jr., and Chris Chiulli testified. Posttrial briefs were filed by the parties, and closing argument was held on March 17, 2014.

The principal issue at trial focused on the scope of the contract between the parties as memorialized in a letter dated February 4, 2008, which was admitted into evidence as a full exhibit by agreement of the parties.[1] The defendants claim that their obligation to pay the plaintiff $30,000 related to a specific deal concerning Lots 3A and 3B as contemplated on February 4, 2008, which deal ultimately failed, while the plaintiff claims that the defendants' obligation to pay him $30,000 was open-ended and extended to the defendants' ultimate sale of the lots in question in February, 2011.

The court finds the following facts. Lots 3A and 3B Alumni Road were originally owned by Newington Business Park (NBP). In 2003, Double "C" entered into an agreement with NBP, giving the defendants the right to purchase Lots 1, 2, 3 (3A and 3B).[2] On April 10, 2006, NBP passed a resolution authorizing the sale of the lots to the defendant Double "C" and/or its assignees for a total amount of $187,000. In 2006 and 2007, the parties had verbal agreements relating to the purchase of Lot 3 for $72,000. According to the 2006 agreement between the parties, the defendants were to assign their right to purchase Lot 3 to the plaintiff. Thereafter, the plaintiff was to purchase Lot 3 from the defendants for $72,000 with $57,000 going to NBP and $15,000 going to the

defendants. The 2007 agreement contemplated the plaintiff purchasing Lots 3A and 3B directly from NBP for $57,000 and then paying the defendants $15,000. Under both scenarios, the total to be paid by the plaintiff for the lots was $72,000, with $15,000 going to the defendants. The 2006 agreement required two closings, while the 2007 agreement contemplated one closing. The plaintiff planned to sell one of the lots and keep the remaining lot for his own use.

The plaintiff filed a notice on the Newington land records, dated October 8, 2007, of the defendants' assignment to him of their right to purchase Lots 3A and 3B.[3] The plaintiff spent approximately $9500 for engineering work and other costs relating to the subdivision of the property. Neither the 2006 nor the 2007 agreement ever came to fruition because the plaintiff was either unwilling or unable to move forward with the purchase.[4] The plaintiff did not pay the defendants any money or anything else of value for the assignment of the lots.[5]

In 2008, Jim Cassidy, an engineer who did work for both Robert Chiulli, Jr., and Chris Chiulli, approached Chris about a prospective buyer for Lots 3A and 3B. The name of the buyer was Phil Rouquier.[6] Cassidy approached Chris because he knew that Chris "controlled" the deal with NBP. NBP was Chris Chiulli's client. Chris approached Robert about the sale but did not disclose the name of the buyer. There is no dispute that Chris told Robert that the anticipated purchase price for this deal was $140,000. Chris and Robert made a deal, reflected in the February 4, 2008 letter, that if Robert signed a release of the notice of the assignment previously filed on the Newington land records dated October 8, 2007, Chris would pay Robert $30,000 "at the closing for any prior agreements." Robert was aware that Chris had a specific buyer and the specific sales price of $140,000 in mind when he approached Robert about making this deal.

On February 4, 2008, the parties entered into a written agreement (the contract), whereby the defendants agreed that if the plaintiff "signs the February 4, 2008 release of Notice on the Newington Land Records Book 1950 at Page 567 that Robert Chiulli Jr. will receive $30,000 *at the closing for any prior agreements*." (Emphasis added.) The contract was drafted by Chris on behalf of himself and Double "C" Construction, and signed by him and by the plaintiff, Robert Chiulli, Jr. The term "prior agreements" is undefined in the contract. At trial, both parties agreed that parol evidence was required to assist the court in interpreting the contract.

Also on February 4, 2008, the plaintiff executed a release of the notice of the assignment to purchase Lots 3A and 3B. The release was recorded in the Newington land records. At the time that the release of the assignment was filed on the Newington land records, there

was no dispute that Robert had the right as an individual to execute the release. The deal with Rouquier fell through, and Lots 3A and 3B were not sold in 2008 for $140,000.

The plaintiff testified that he believed the contract was not conditioned on a specific buyer purchasing the lots and that the reference to prior agreements applied to any agreements involving the sale of the property. However, in his proposed findings of fact, the plaintiff acknowledges that he knew that Chris had a specific buyer in mind when he approached him about this deal. See Plaintiff's Proposed Findings of Fact and Posttrial Brief, #7, p. 2. The plaintiff also testified that he believed that when a closing on the property occurred, the defendants would be required to pay him $30,000. He further testified that he believed $30,000 was a fair amount because of his time and expense he incurred in developing the property in the approximate amount of $9500. Chris Chiulli testified that he believed it was clear that the contract applied specifically to the anticipated agreement with Rouquier and the sales price of $140,000 for Lots 3A and 3B. Chris further testified that the plaintiff never paid him for the assignment of the lots in the first place and that the defendants also incurred substantial expense in an effort to develop and sell the lots. If the deal with Rouquier had gone through, Chris would have paid the plaintiff the agreed upon amount of $30,000.

In June, 2008, the plaintiff sustained serious injury from an assault in a Massachusetts bar or restaurant that left him in a coma and hospitalized until December, 2008. He did not learn that the Rouquier deal fell through until after he got out of the hospital. The injury caused him to suffer some memory loss. The plaintiff filed a personal injury lawsuit in connection with the assault. In November, 2011, the plaintiff entered into a stipulated judgment with Mount Sinai Hospital for a bill relating to his hospitalization and rehabilitation from his injuries. The stipulation provided for a reduced amount if payment of the judgment was made by a specified date. In an effort to raise that amount, he was required to raise $100,000 by November, 2012, which necessitated the sale of some of his assets, including the sale of his Mercedes to Chris for $23,000. At the end of 2012, the plaintiff settled his lawsuit for five (5) million dollars, after three weeks of trial.

After the Rouquier deal fell through, Chris assumed that he and Robert would revert to their prior agreements whereby Robert would purchase the property and Chris would get $15,000 at the time of the closing. Chris offered to sell the lots to Robert after the Rouquier deal fell through and after Robert got out of the hospital, but Robert lacked the financial resources at that time to commit to a purchase. There is no evidence that at any time between February, 2008,

and February, 2011, the plaintiff sought to purchase or sell Lots 3A or 3B.

On February 18, 2011, Chris Chiulli purchased Lots 1, 2, 3A and 3B from NBP for $187,000 plus closing expenses for a total of $194,935.85. The settlement statement (Defendants' Exhibit D) reflects a $100,000 credit to Chris for money owed to him by NBP. The total cost to the defendants for purchase of the property was $86,892.35 plus $43,880.53, for a total of $130,772.88.

The same day, February 18, 2011, Double "C" sold Lots 2, 3A, and 3B to Michael Geer for a total amount of $141,674, including the deposit. (Defendants' Exhibit B.) After the payoff of a second mortgage, the defendants received $131,624.96. The defendants did not inform the plaintiff of the sale of Lots 2, 3A, and 3B and did not pay him $30,000 from the proceeds. This transaction included Lot 2, which was not part of any agreement between the parties.

In May, 2011, the defendant Double "C" sold Lot 1 to Daniel Pizzoferrato for $82,240.64. The net sale price was $75,464.64 after settlement charges and closing costs. (Defendants' Exhibit C.) The settlement statement lists the purchase price as $82,241. In this transaction, $75,465 was paid from the proceeds to the Internal Revenue Service. (Defendants' Exhibit C, line 504.) Lot 1 was not part of any agreement between the parties and was sold in a separate transaction.

The defendant Double "C" paid NBP a total of $194,934.85 for Lots 1, 2, 3A and 3B and received a total of $207,089.60 from the sale of the lots. After development costs and closing expenses, Double "C" netted only $12,154.75 from these transactions. After purchasing the four lots for $194,934.85 and then selling Lots 2, 3A, and 3B for $131,674, the defendants experienced a shortfall of approximately $63,000 without taking into account development costs that exceeded $100,000. The plaintiff did not learn about the sale of Lots 3A and 3B until 2012 when he checked the Newington land records and found out that the properties had been sold, at which time he immediately demanded payment.

Although there are credibility issues relating to the testimony of both Robert Chiulli and Chris Chiulli, they are not material to the resolution of this lawsuit. There is no question that in February, 2011, Robert Chiulli could have used the $30,000 to help pay his hospital bill and believes his cousin Chris withheld moneys that could have helped at a critical time. Robert believes that Chris was less than forthcoming about the ultimate disposition of Lots 3A and 3B. However, the testimony of both individuals reflects what amounts to bad blood between them, which does not alter the essential facts of the case or the legal issues presented.

I

STANDARD OF PROOF

"While a plaintiff is entitled to every favorable inference that may be legitimately drawn from the evidence, and has the same right to submit a weak case as a strong one, the plaintiff must still sustain the burden of proof on the contested issues in the complaint and the defendant need not present any evidence to contradict it." *Gulycz* v. *Stop & Shop Cos.*, 29 Conn. App. 519, 523, 615 A.2d 1087, cert. denied, 224 Conn. 923, 618 A.2d 527 (1992). The general burden of proof in civil actions is on the plaintiff, who must prove all the essential elements of the causes of action set forth in the complaint by a preponderance of the evidence. Id.

## II

### COUNT ONE—BREACH OF CONTRACT

In count one of the complaint, the plaintiff alleges breach of contract. The plaintiff first argues that the February 4, 2008 contract was a valid and binding document which was breached by the defendants' failure to pay him $30,000 upon the closing of the sale of Lots 3A and 3B on February 18, 2011. The defendants counter that their promise to pay $30,000 was a one-time deal based on a specific sale of Lots 3A and 3B for $140,000. The defendants also assert that, in any event, Robert Chiulli, Jr., did not have the authority to sign the release of the assignment, and therefore, there was no valid consideration for the February 4, 2008 agreement and the contract was unenforceable for that reason alone.

"The essential terms of a valid contract are an offer, acceptance of that offer, and consideration." *Cimino* v. *Drucas Builders, LLC*, Superior Court, judicial district of Middlesex, Docket No. CV-09-5007828 (December 30, 2011) (*Abrams, J.*), aff'd, 141 Conn. App. 905, 62 A.3d 643, cert. denied, 309 Conn. 914, 70 A.3d 38 (2013).

In the present case, there was an offer made by the defendants to pay Robert Chiulli, Jr., $30,000 "at the closing for any prior agreements," if Robert was to sign a release of the notice of assignment from the defendants of their option to buy Lots 3A and 3B from NBP filed on the Newington land records dated October 8, 2007. Acceptance of these terms was evidenced by the signatures of the parties to the transaction.

The defendants argue that the stated consideration for the $30,000 payment by the defendants is illusory because Eastern Development, LLC, not Robert Chiulli, Jr., was assigned the option to buy Lots 3A and 3B, and therefore, Robert had no authority to sign a release of the assignment in his individual capacity.

"Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. . . . Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact and subject to review under the clearly erroneous standard. . . . The conclusion

drawn from the facts so found, i.e., whether a particular set of facts constitutes consideration in the particular circumstances, is a question of law . . . and, accordingly, is subject to plenary review. . . . [T]he doctrine of consideration does not require or imply an equal exchange between the contracting parties . . . . The general rule is that, in the absence of fraud or other unconscionable circumstances, a contract will not be rendered unenforceable at the behest of one of the contracting parties merely because of an inadequacy of consideration." (Citation omitted; internal quotation marks omitted.) *Milford Bank* v. *Phoenix Contracting Group, Inc.*, 143 Conn. App. 519, 529, 72 A.3d 55 (2013).

The admissible evidence establishes that the consideration, as recited in the February 4, 2008 agreement, was valid. The only mention of Eastern Development, LLC, as the assignee of the right to purchase Lots 3A and 3B, is in the unsigned "Assignment and Assumption Agreement," dated May 17, 2006, one of several documents contained in Defendants' Exhibit A. Further, the notice of assignment, dated October 8, 2007, filed on the land records, states that Double "C" Construction and/or Chris Chiulli assigned their rights to purchase the property to an assignee stated as "Robert Chiulli, Jr." No other party is listed as assignee, and the notice is signed by Robert Chiulli, Jr., individually. Further, the reference in the February 4, 2008 contract is to "the February 4, 2008 release of Notice on the Newington Land Records Book 1950 at page 567," which volume and page number is the location of the notice of assignment executed and filed by Robert Chiulli, Jr., on October 8, 2007.[7] No one questioned the validity of the release of the assignment as consideration for the contract until the trial of this lawsuit, and the court finds no legitimate basis for this claim. In his testimony, Chris Chiulli never disputed the authority of Robert to execute the release of the assignment contained in Plaintiff's Exhibit 1. For these reasons, the court finds by a preponderance of the evidence that Robert Chiulli, Jr., had the authority to execute the release of the notice of assignment and to file it on the Newington land records. Therefore, the plaintiff has proven by a preponderance of the evidence that there was valid consideration for the defendants' payment of $30,000.

The more significant issue concerning the February 4, 2008 agreement is the meaning of the phrase "at the closing for any prior agreements." The plaintiff argues this phrase reflects an open-ended promise to pay him $30,000 at any closing of the sale of Lots 3A and 3B, including the sale concluded with Michael Geer on February 18, 2011. On the other hand, the defendants argue that at the time of the February 4, 2008 contract, the parties had a specific understanding that the performance of the contract contemplated only a specific sale to a buyer (Rouquier) for $140,000, and that "for any prior agreements" referred to the previous verbal

agreements between them from 2006 and 2007, whereby the plaintiff would purchase the property at a cost of $72,000 in one or two transactions and the defendants would receive $15,000 at the closing.

"[T]he determination as to whether contractual language is plain and unambiguous is itself a question of law subject to plenary review." *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 101–102, 84 A.3d 828 (2014). "In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Citations omitted; internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 670, 791 A.2d 546 (2002). "In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." (Citations omitted; internal quotation marks omitted.) Id., 670–71. "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." Id., 671. When a contract is ambiguous the court must consider extrinsic evidence and make factual findings as to the parties' intent. *Cruz* v. *Visual Perceptions, LLC*, supra, 106.

The term "at the closing for any prior agreements" is not defined within the contract and is unquestionably ambiguous, requiring consideration of extrinsic evidence in the form of the testimony and exhibits submitted in evidence at trial. Based on all the relevant evidence, the court finds that the plaintiff has failed to prove the validity of his interpretation of the contract by a preponderance of the evidence.

As previously discussed, there is undisputed evidence of agreements between the parties prior to February 4, 2008, one in 2006 and another in 2007. In the 2006 agreement, the parties agreed that Robert would purchase Lots 3A and 3B from the defendants for $72,000, $57,000 of which would be paid to NBP and $15,000 would be paid to the defendants. In 2007, the parties agreed that Robert would purchase the lots directly from NBP, and the defendants would receive $15,000 at the closing. Further, $30,000 is twice the sum of $15,000 that the parties had agreed that the defendants would receive in either the 2006 or 2007 agreement. It is

unlikely that Chris reasonably would have contractually committed to pay Robert $30,000, unless Chris was certain that he would be able to deliver that sum to Robert and make a more substantial profit for himself and Double "C."

The language of the contract states that if the plaintiff signed the February 4, 2008 release of the notice of assignment on the Newington land records, the defendants promised that the plaintiff "will receive $30,000 at *the* closing for any prior agreements." (Emphasis added.) Robert's testimony confirmed that he knew that Chris had a specific buyer in mind when Chris came to him about this deal. He also knew that Chris anticipated a sale of Lots 3A and 3B to that buyer for $140,000, with no mention of any other sales price. In addition, the use of the specific participle "the" before the word closing, further suggests that a particular closing was contemplated. Although the contract sales price to Michael Geer on February 18, 2011, was listed on the settlement statement as $140,000, that sale also included Lot 2, a parcel not covered by the February 4, 2008 agreement, which only covered Lots 3A and 3B.[8]

Finally, the plaintiff argues that because Chris Chiulli drafted the contract, its terms must be construed against him. However, the Supreme Court has recently determined that this rule of interpretation is only to be used as a last resort when the court finds the contract language ambiguous *after* considering the external evidence. *Cruz* v. *Visual Perceptions, LLC*, supra, 311 Conn. 108 ("[i]t would make absolutely no sense to require the trial court to construe the agreement against the defendant if the extrinsic evidence showed that it was more likely than not that the parties had a contrary intent"). Here, the court has considered extrinsic evidence and finds that the evidence reflects more likely than not that the contract was intended by the parties to be limited to a specific sale of the property for $140,000 to a particular buyer. Therefore, the drafting of the document by the defendants is not an appropriate factor for consideration by the court. Based on all the foregoing evidence, the court finds that the plaintiff has failed to prove by a preponderance of the evidence that the February 4, 2008 contract was open-ended and extended to any closing of a sale of Lots 3A and 3B, including the February 18, 2011 sale of the property to Michael Geer.

## III

### COUNT TWO—CONVERSION AND THEFT

In count two of his complaint, the plaintiff seeks a judgment of attorney's fees and treble damages for the defendants' alleged conversion and civil theft of $30,000 out of the moneys received from the sale of Lots 3A and 3B to Michael Geer on February 18, 2011.

Conversion has been defined as "an unauthorized

assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights." *Mystic Color Lab, Inc.* v. *Auctions Worldwide, LLC*, 284 Conn. 408, 418, 934 A.2d 227 (2007). Statutory theft requires an intent to deprive the owner of his property. *Suarez-Negrete* v. *Trotta*, 47 Conn. App. 517, 521, 705 A.2d 215 (1998). Thus, in order for the plaintiff to prevail in claims of statutory theft and conversion, he or she must prove a sufficient property interest in the item. See *Discover Leasing, Inc.* v. *Murphy*, 33 Conn. App. 303, 309, 635 A.2d 843 (1993) (prima facie case for conversion and statutory theft requires proof that property in question "belonged to" plaintiff). "A mere obligation to pay money may not be enforced by a conversion action . . . and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied. . . . Consistent with this rule, in our case law sustaining a cause of action wherein money was the subject of the conversion or theft, the plaintiffs in those cases at one time had possession of, or legal title to, the money." (Citations omitted; internal quotation marks omitted.) *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 772, 905 A.2d 623 (2006). "Accordingly, a claim for conversion may be brought when the relationship is one of bailor and bailee but not when it is one of debtor and creditor." *Mystic Color Lab, Inc.* v. *Auctions Worldwide, LLC*, supra, 419.

The plaintiff in this case has not provided any evidence supporting the conclusion that he at one time had possession or legal title to the $30,000 he claims he was promised by the defendants. There is no evidence that the plaintiff ever gave the defendants any money to hold for him, that he ever had a lien on the subject property in expectation of the fulfillment of the contract, or that the plaintiff in any other way had any ownership of the amount at any time in the transactions. The contract at issue states that the defendants promised to pay the $30,000 to Robert Chiulli based on a sale of Lots 3A and 3B "at the closing for any prior agreements." A mere promise to pay money is not sufficient to prove ownership of that money, and is not enough to sustain a claim of statutory theft or conversion. Therefore, the plaintiff has failed to prove his claims of conversion and statutory theft by a preponderance of the evidence.[9]

### CONCLUSION

Accordingly, for all the foregoing reasons, the court finds that the plaintiff has failed to sustain his burden of proving either count one or count two by a preponderance of the evidence. Accordingly, the court hereby enters judgment in favor of the defendants.

* Affirmed. *Chiulli* v. *Chiulli*, 161 Conn. App. 638,    A.3d    (2015).

[1] Plaintiff's Exhibit 2.

[2] At some point in the course of the transactions between the parties Lot 3 was subdivided into Lots 3A and 3B.

[3] The notice of assignment is contained in the evidence as Defendants' Exhibit A. The assignment itself is not in evidence other than by way of the testimony of Robert Chiulli, Jr., and Chris Chiulli.

[4] Documents relating to the 2007 agreement are all contained in Defendants' Exhibit A. The documents reflect that the plaintiff was informed by the president of NBP of an environmental issue relating to the property on or about January 30, 2007.

[5] There is no dispute that Eastern Development, LLC, was owned by the plaintiff and that an assignment by Double "C" and Chris Chiulli of Lots 3A and 3B was apparently made to the plaintiff before October 8, 2007, when the notice of assignment (signed by Robert Chiulli, Jr., only), is dated. What is less clear is to whom the assignment was made, Eastern Development, LLC, or the plaintiff. The document which purportedly reflects the actual assignment is unsigned and is contained in Defendants' Exhibit A. The notice of assignment, filed on the Newington land records, which is also included in Exhibit A, lists the assignee as Robert Chiulli, Jr., and is signed by him, individually. In addition, the release of the assignment, dated February 4, 2008, Plaintiff's Exhibit 1, was also executed by the plaintiff individually. Although the defendants have made much of their claim that the assignment was actually made to Eastern Development, LLC, a limited liability company owned by the plaintiff and not the plaintiff, individually, the only evidence of this is the unsigned "Assignment and Assumption Agreement," contained in Defendants' Exhibit A. As discussed later on in this memorandum, this is not a valid issue in this case, and therefore, is not a factor in the decision of the court.

[6] The spelling of this name is unclear as neither of the witnesses were able to give a definitive spelling.

[7] The precise wording in the contract is that, "Double C Construction and Chris Chiulli agree that if Robert Chiulli signs the February 4, 2008 release of notice on the Newington Land Records Book 1950 at Page 567 that Robert Chiulli will receive $30,000 at the closing for any prior agreements."

[8] The plaintiff offered no evidence concerning the value of Lot 1 and the defendants had no reason to.

[9] The plaintiff cites to the case *William Raveis Real Estate, Inc.* v. *Brancale*, Superior Court, judicial district of Fairfield, Docket No. CV-11-6019722-S (January 29, 2013) (*Sommer, J.*), in support of their argument that conversion and statutory theft can properly be pleaded in an action based on a breach of contract. However, in contrast to the present case, the dispute in *Brancale* concerned an unpaid contractual commission for a known and definite sale that had already occurred.